## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

IN THE MATTER OF:

SKYTEC, INC.,

**Debtor**

CASE NO. 18-05288-EAG
CHAPTER 11

### JOINT PRE-HEARING REPORT

Now come Movant, Logistic Systems, Inc. ("LogiSYS") and Debtor, Skytec, Inc., through their undersigned counsel, and respectfully set forth their Joint Pre-Hearing Report in preparation for the evidentiary Hearing to be held on August 28 and 29, 2019:

### I.    JOINT STATEMENT OF STIPULATED FACTS

1.    Skytec, Inc. (hereinafter the "Debtor" or "Skytec") is a privately-owned corporation with only two shareholders, Mr. Henry Barreda Rivera and Mr. Miguel Jose Carbonell. *See*, Statement of Financial Affairs, item # 81 (b), Dkt. # 29, at p. 35.

2.    Skytec is primarily engaged in the sale and installation of communications, emergency, and security systems, and software development and integration. *See* Disclosure Statement, Dkt. # 91, at p 13.

3.    On September 12, 2018 ("the Petition Date"), Skytec filed its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. *See*, Petition, Dkt. # 1.

4.    Earlier on that same date, the United States District Court for the District of Puerto Rico (the "District Court") had issued an Opinion and Order (the "District Court Order") wherein the District Court dismissed with prejudice Skytec's claims against Logistic Systems, Inc.

1

("LogiSYS") and entered default as to LogiSYS's counterclaims in a civil case pending before it. *See Skytec, Inc. v. Logistic Systems, Inc.*, Civil No. 15-2104 (BJM) ("the Civil Case"), Opinion and Order, Sep. 12, 2018, *see* Civil Dkt. # 160.

5.      LogiSYS's counterclaims in the Civil Case were based on the collection of amounts allegedly owed by Skytec under Subcontractor Agreements on four projects: Puerto Rico Emergency Management Services Administration ("AEMEAD"), Puerto Rico Law Enforcement Dispatch System ("PRLEDS"), METRO I, and METRO II. *See* Opinion and Order, March 15, 2019, Civil Dkt. #184 at p. 2.

6.      Pursuant to the Opinion and Order, the money allegedly owed by Skytec to LogiSYS can be broken into three categories: payments due on completion of contractual milestones, license and maintenance fees, and service charge accrual on sums not paid within sixty days of the invoice. *See* Opinion and Order, Civil Dkt. #184 at p. 3.

7.      The District Court adopted a six percent (6%) interest rate on unpaid invoices as of the date of Skytec's Petition Date, so the service charges allegedly owed on the license and maintenance fees through September 12, 2018 total $496,964. *Id*.

8.      The District Court concluded, after entering default against Skytec and not allowing Skytec to present evidence at the evidentiary hearing, that Skytec owed LogiSYS under the agreements $357,186 for program installations, $2,414,898 for annual license and maintenance fees, and $496,964 for service charges on those tardy fee payments, which is a total of $3,269,048. *See* Opinion and Order, Civil Dkt. #184 at p. 4.

9.      The District Court concluded, after entering default against Skytec and not allowing Skytec to present evidence at the evidentiary hearing, that except for the amount calculated for service charges, the amounts owed for program installations and annual license and maintenance fees ($357,186 + $2,414,898 = $2,772,084) were owed by Skytec to LogiSYS had been accrued up to

2

January of 2017 the time between Skytec terminating their relationship and the end of the required

sixty-day notice for terminating the contractual agreements. *See* Opinion and Order, Civil Dkt. #184

at p. 2.

10.     The stated "reason for filing the captioned bankruptcy was the (imminent) judgment

to be issued against Debtor in a lawsuit with one of its prior vendors." *See* Civil Dkt. #52, p. 2.

11.     On November 15, 2018, this Honorable Court entered an Order granted at a hearing

held on November 13, 2018, to modify the automatic stay, and allow LogiSYS to conclude its

litigation against Debtor to judgment. *See* Civil Dkt. # 70.

12.     On January 15, 2019, Logistic filed Proof of Claim No. 9 in the amount of

$5,167,601.86, pending a final judgment from the U.S. District Court for the District of Puerto

Rico in *Skytec, Inc. v. Logistic Systems, Inc.*, Civil No., 15-2104(BJM). *See* Claims Register POC

# 9.

13.     The default damages hearing was held on February 13, 2019. The District Court

entered judgment in March 15, 2019 in the amount of $4,161,858.38. *See* Civil Dkt. #186.

14.     On May 23, 2019, on reconsideration, the District Court entered an amended order

and judgment in favor of LogiSYS in the amount of $ 4,286,297.07. *See* Civil Dkt. # 188.

15.     LogiSYS amended its Proof of Claim on June 28, 2019 to reflect the Amended

Judgment amount of $ 4,286,297.07. *See* Claims Register, POC # 9.

16.     Although the District Court's Opinion and Orders do not states so, Skytec attributes

to "bad case management" having lost the LogiSYS litigation. *See* Disclosure Statement, Dkt. #91,

at p.16.

17.     Skytec contends that the misconduct that the District Court found that it was

engaged in the LogiSYS litigation was solely related to discovery issues due to its prior legal

representation. *See* Opposition to Logistic Systems, Inc.'s Motion for Appointment of Chapter 11
Trustee, Dkt #181, at p.8.

18.      Skytec included its prior law firm among its list of Creditors with Non-Priority
Unsecured Claims. *See* Petition Schedule E/F, Dkt. 29, at p. 18; Amended Schedule E/F, Dkt.
#212-2, at p. 4.

19.      Skytec did not list its prior law firm's claim as either contingent, unliquidated, or
disputed, or that it is subject to any offset. *See, id.*

20.      Mr. Henry Barreda Rivera is Skytec's president. *See*, Petition, Dkt. # 1.

21.      Mr. Barreda supervises the daily operations at Skytec. *See* Transcript of Hearing on
Final Approval on Amended Disclosure Statement Dated 04/15/2019 (Dkt. #175) and
Confirmation Hearing of Ch. 11 Plan Dated 01/16/2019 (Dkt. #92) and Objection to the Disclosure
Statement Filed by Logistic Systems, Inc. (Dkt. #184) ("Hearing Transcript"), at p. 54.

22.      Mr. Barreda supervises most of Skytec's 28 employees, except the two employees
that Ms. Annie Astor supervises in the accounting and finances area of the company. *See id.* at pp.
54-55.

23.      Ms. Astor, spouse of shareholder Miguel José Carbonell, is an independent
contractor acting as Debtor's Chief Financial Officer ("CFO"). *See id.* at p.51

24.      Although she passed the licensing test for certified public accountant and worked
as such for many years, Ms. Astor has not had an active certified public accountant license for
more than ten years. *See id.*, at p. 52.

25.      Ms. Astor worked at FirstBank for twenty-three years. *See id.*

26.      Ms. Astor worked as Chief Financial Officer at FirstBank. *See id.*

27.     Ms. Astor works full-time at Skytec, overseeing, supervising, and managing Skytec's financial affairs. *See id.* at p. 53.

28.     Ms. Astor was designated by Skytec to testify on its behalf in the Section 341 creditor's meeting in this case. *See id.*

29.     Ms. Astor assisted in the preparation of all three of the productions of documents that Skytec has served upon the Court and the parties in this case. *See id.*

30.     Ms. Astor also produced documents in response to a Rule 2004 examination requested by Logistics in this case. *See id.*

31.     Ms. Astor is familiar with the information that was used to prepare all the schedules on this case. *See id.*

32.     Ms. Astor is familiar with the documents that allowed Skytec to prepare the statement of financial affairs in this case. *See id.* at p. 54.

33.     Ms. Astor provided to Mr. Luis Carrasquillo, Skytec's Financial Advisor in this case, information that he used to prepare the Disclosure Statement in this case. *See id.*

34.     Ms. Astor supervises, jointly with Mr. Barreda, the management of the accounts receivables at Skytec. *See, id.* at p. 55.

35.     Ms. Astor supervises Skytec's management of its cash flow. *See, id.* at pp. 55-56.

36.     Apart from Ms. Astor, Skytec has about four or five other independent contractors who work on specific company projects. *See, id.* at p. 55.

37.     Mr. Barreda has the final decision-making authority to hire employees and professional contractors at Skytec. *See, id.* at p. 57.

38.     Mr. Barreda and Ms. Astor have the final decision-making authority on those individuals' compensation. *Id.*

39.     Skytec's board of directors have the final say on the compensation to be paid to Mr. Barreda and Ms. Astor. *See id.* at p. 62.

40.     The board of directors at Skytec is composed of Mr. Barreda, Ms. Astor, and Ms. Astor's husband, Mr. Carbonell. *See id.*

41.     The board of directors includes all of Skytec's shareholders. *See id.*

42.     Mr. Barreda and Ms. Astor's compensation packages have not changed in ten years. *See id.* at p. 63.

43.     There is no corporate resolution indicating Mr. Barreda's and Ms. Astor's compensations packages. *See id.*

44.     Ms. Astor does not have a written independent contractor agreement with Skytec. *See,* id. at pp. 57, 88.

45.     Not all independent contractors who work at Skytec have written agreements. *Id.*

46.     Some of Skytec's independent contractors work there and invoice Skytec for their time. *See, id.* at p. 58.

47.     Ms. Astor also has participated in supplying information for the preparation of Skytec's Monthly Operating Reports that are submitted to the Court in this case. *See id.*

48.     Ms. Astor is one of the persons who supply the information to Skytec's accountants for the preparation of Skytec's tax returns, which is done by submitting Skytec's trial balances after they are audited to the tax return preparer at Carbonell & Co. *See id.* at p. 64.

49.     Skytec does not report certain aspects of Mr. Barreda's and Ms. Astor's compensations to the Puerto Rico tax authorities because it believes that they are not required to be reported. *See id.* at p. 83.

50.     Among the aspects of Mr. Barreda's and Ms. Astor's compensations that are not reported to the Puerto Rico tax authorities are:

    a.    Rental payments to Mr. Barreda, *see* Hearing Transcript at p. 86

    b.    Auto loan payments on the automobile used by Ms. Sandra Iglesias, Mr. Barreda's wife, *see id.* at p. 87.

51.     Even after the filing of the petition in bankruptcy, Skytec has not discussed the possibility of adjusting the compensation of its officers because it believes that their compensation is fair for the work they do. *See id.*, at p. 90.

52.     Skytec has no written agreement with Mr. Barreda by which Skytec agrees to pay Mr. Barreda's mortgage obligation on a property that he has stated is his own. *See id*.

53.     Debtor originally listed LogiSYS's claim as contingent, unliquidated and disputed in the amount of $ 3,711,945. *See*, Dkt. # 1, at p. 6.

54.     Debtor has disclosed that it intends to prosecute no avoidance actions in this case. *See* Amended Disclosure Statement, Dkt # 175 at pages 33-34.

55.     The Monthly Operating Report for January 2019, Dkt # 113, page 18, revealed a post-petition Christmas bonus paid to Debtor's president[1], in the amount of $5,000, in addition to the bonus granted in December in the amount of $554.10. *See* MOR for December 2018, Dkt. # 113, page 16.

56.     Skytec's other employees received $554.10 as Christmas Bonuses.

57.     Debtor is not allowed to declare dividends under its term loan agreement with Oriental Bank, as modified on July 31, 2017. Oriental Bank Term Loan Agreement Exh. 6, p. 4.

---

[1]    As confirmed in the Rule 2004 Examination by Mr. Henry Barreda, page 31 **Exh. 30**.

58.    Debtor has paid monthly rent of $9,175 to Mr. Barreda on real property owned by him as part of his compensation package. *See* Statement of Financial Affairs, Dkt. # 29, at 47.

59.    Ms. Sandra Iglesias is Mr. Barreda's wife and does not work or perform any duties for Debtor.

60.    Debtor's business had been declining since 2013. *See* Disclosure Statement, Dkt # 91, at page 15.

61.    Ms. Astor does not remember the last time when the shareholders discussed any changes to their compensation. ***See* Exh. 29**, Transcript of Ms. Annie Astor's Rule 2004 Examination at pp. 54-56.

62.    Note 4 to the 2017 financial statements disclosed the amount of $107,544 owed by Prodetec, with no collectability reserve, and indicate that it is for cash advances and payments made on behalf of an affiliate.

63.    Mr. Barreda is one of the owners of Prodetec. *See* his Rule 2004 Examination, **Exh. 30,** at p. 66**.**

64.    Skytec's accounts receivables are stated as of October 31, 2018 at Note D to the Liquidation Analysis to the Disclosure Statement, Dkt. # 91-5, p. 7, and to the Amended Disclosure Statement, Dkt 175-6, p.8.

65.    The trade accounts receivable are stated at p. 8 in the amount of $1,436,147. Debtor's Liquidation Analysis for Amended Disclosure Statement, Dkt 175-6, p.8.

66.    As of October 31, 2018, Skytec's accounts receivable amounts to $1,173,811 according to the October MOR after deducting an allowance for uncollectible amounts. **Exh. 19**. (Dkt 66)

67.    As part of the supporting documents to the Monthly Operating Report for September 2018, Debtor provided copy of a statement of account #1409200705 at Firstbank, where Debtor had its bank account before the filing of the petition. *See* Dkt. 63, pages 68-70. **Exh. 18**.

68.    Skytec issued check number 8508, in the amount of $1,000, payable to Alfredo Jimenez, CPA on September 4, 2018.  **Exh 8 (Dkt 29), Exh 18 (Dkt 63)**.  See also **Exh. 59**.

69.    Skytec issued check number 8527 in the amount of $42,541.14, payable to Adriel Longo on September 6, 2018. Id.

70.    Skytec issued check number 8526 in the amount of $65,537.93, payable to Tessco on September 7, 2018. Id.

71.    Skytec issued check number 8530 in the amount of $31,745.12, payable to Jorge Rivera on September 6, 2018. Id.

72.    Skytec issued check number 8534 in the amount of $38,179.88, payable to MVS Leading Satellite on September 10, 2018. Id.

73.    Skytec issued check number 8543 in the amount of $13,122.32, payable to Zoll Data on September 10, 2018. Id.

74.    Skytec issued check number 8532 in the amount of $344,699.90, payable to Daniels Electronics on September 10, 2018. Id.

75.    Skytec issued check number 8533 in the amount of $29,212.94, payable to Kenwood Comm. Corp. on September 10, 2018. Id.

76.    Skytec issued check number 8560 in the amount of $331.29, payable to Tessco on September 12, 2018.  Id.

77.    Skytec issued check number 8536 in the amount of $4,010, payable to REI on September 10, 2018. Id.

78.     Skytec issued check number 8555 in the amount of $2,322.0, payable to Carbonell & Co. on September 11, 2018. Id.

79.     Skytec issued check number 8559 in the amount of $1,024.66, payable to Kenwood Comm. Corp. on September 12, 2018. Id.

80.     Skytec issued check number 8540 in the amount of $3,200, payable to Alfredo Jimenez, CPA on September 10, 2018. Id.

81.     Skytec issued check number 8542 in the amount of $1250, payable to Shakil Shafique on September 10, 2018. Id.

82.     First Subcontractor Agreement for a Computer-Aided Dispatch and Records Management System (AEMEAD) between Logistic Systems and Skytec was signed on December 31, 2009.

83.     Second Subcontractor Agreement for a Computer-Aided Dispatch and Records Management System (LEDS) between Logistic Systems and Skytec was signed on June 22, 2011.

84.     Third Subcontractor Agreement for a Computer-Aided Dispatch and Records Management System (LE Metro II) between Logistic Systems and Skytec was signed on October 4, 2011.

85.     Fourth Subcontractor Agreement for a Computer-Aided Dispatch and Records Management System (LE Metro I) between Logistic Systems and Skytec was signed on November 17,2011.

86.     On January 23, 2019, Logistics' counsel forwarded a letter to Skytec's bankruptcy counsel requesting Debtor to file avoidance actions and granting 15 days to advise Skytec's position.  (See Letter from Mr. Carlos A. Rodriguez Vidal dated January 23, 2019.)

## II.    PROPOSED ADDITIONAL FINDINGS OF FACT

**A. Movant LogiSYS:**

1.      The Amended Final Judgment of the U.S. District Court against Skytec is final and unappealable. *See Skytec, Inc. v. Logistic Systems, Inc.*, Civil No. 15-2104 (BJM) ("the Civil Case"), Amended Final Judgment, May 23, 2019, Civil Dkt. #189. **Exh. 5**.

2.      The Amended Final Judgment is based on the District Court's Opinion and Order dated March 15, 2019, *see* Civil Dkt. #184, and the Amended Order dated, May 23, 2019, *see* Civil Dkt. # 188. **Exh. 4**.

3.      The money owed by Skytec to LogiSYS under the Amended Final Judgment can be broken into three categories: payments due on completion of contractual milestones, license and maintenance fees, and service charge accrual on sums not paid within sixty days of the invoice. *See*, Opinion and Order, Dkt. #186, at p. 3. **Exhs 2 & 3**.

4.      By subtracting the money Skytec paid from the sum owed to LogiSYS on the invoices, Skytec owed $357,186 for program installations. Through the same method, Skytec owed Logistic $2,414,898 for annual license and maintenance fees. *See* Order, March 15, 2019, Civil Dkt. #184 at p. 4. **Exh. 2**.

5.      Of the amounts adjudged to be owed by Skytec that were part of the imminent judgment that was to be entered against it in the Civil Case, Skytec only recorded $495,535 as an account payable and $663,964 as an accrued expense in its accounting books. *See* Exhibits 4, 5, and 6 of Mr. Carlos Baralt's Expert Report, July 23, 2019. **Exh. 70**.

6.      Earlier in the Civil Case, on May 4, 2017, the District Court had granted in part a Motion to Compel or to Strike Experts filed by LogiSYS in the Civil Case, in which it disallowed Skytec's experts in the case. *See* Civil Dkt. # 59. **Exh. 6**.

11

7.      On June 25, 2017, Skytec, through its attorney, attempted to use the reports of its excluded experts to support a motion for summary judgment that had been embedded in its Opposition to LogiSYS's Motion for Contempt, see Civil Dkt. #66.

8.      On July 3, 2017, LogiSYS moved to strike the embedded motion for summary judgment. See, Civil Dkt. # 70. **Exh. 7**.

9.      On July 31, 2017, Skytec, through its attorney, opposed LogiSYS's Motion to Strike on various grounds, including the argument that "based on the nature of the facts and claims pending in this case, the exclusion of plaintiff's expert reports operate effectively as the dismissal of the complaint and a judgment for defendant on the counterclaim. In fact, defendant is gearing this Honorable Court in said direction. Resultantly (sic), this Honorable Court's ruling to exclude such plaintiff's reports is not an interlocutory determination but a final matter leaning on the merits of this case." *See* Skytec's "Response in Opposition to Defendant's Motions Entered at Dkt. No. 70 and Dkt. No. 71," July 31, 2017, Civil Dkt. # 75 at pp. 5-6. Id.

10.     When Mr. Carrasquillo refers to Skytec's management in the documents that he prepared, he refers to the assistance provided by Ms. Astor for him to perform his work in this case. *See* **Exh. 74** "Hearing Transcript" at page 54-55.

11.     Skytec issued check number 8529, in the amount of $10,056.33, payable to Fernando Carbonell on September 6, 2018. Firstbank honored Check number 8529 on September 12, 2018. **Exhs. 8, 18, 59**.

12.     The tax returns filed by Skytec corresponding to years 2014, 2015, 2016, and 2017 do not segregate the compensation paid to its officers. **Exh. 74.** *See Hearing Transcript* at pp. 67-69.

13.     During the 90 days before the petition date, the Debtor significantly reduced its accounts payable by making disbursement to vendors and suppliers of which $2,290,976.31 appear

as payments on account of antecedent debts, or payments for the benefit of insiders. *See*, Debtor's

Statement of Financial Affairs at Dkt. # 29 part 2, question # 3.

14.    Among them, Debtor made the following payments in the amount of $1,633,726.18

to vendors and suppliers on account of antecedent debts:

    a.    Payments on credit cards accounts to cover Skytec's expenses, that are all in the names of insiders Annie Astor, Henry Barreda and Miguel Carbonell- Skytrackers, Inc.:

| | |
|---|---|
| American Express (Miguel Carbonell- Skytrackers, Inc.) | $ 4,433.60 |
| American Express (Annie Astor- Delta Platinum) | $10,788.00 |
| American Express (Miguel Carbonell- Skytrackers, Inc.) | $12,309.69 |
| American Express ((Miguel Carbonell- Skytrackers, Inc.) | $ 3,319.25 |
| Banco Popular PR (Annie Astor) | $52,720.00 |
| Firstbank (Annie Astor) | $ 7,110.56 |
| Oriental Bank (Henry Barreda Rivera) | $31,828.65 |
| **Total:** | **$122,509.75** |

    b.    Payments to several suppliers on account of <u>antecedent debts</u> and payments to third-party suppliers as follows[2]:

| | | |
|---|---|---|
| i. MVS Leading Satellite Comm. | $80,696.74 | $38,179.88 PP |
| ii. Tx RX Systems | $60,611.63 | |
| iii. Ef Johnson | $94,034.00 | |
| iv. Daniels Electronics | $344,699.90 | $344,699.90 PP |
| v. Kenwood Comm. Corp | $82, 089.03 | $30,237.60 PP |
| vi. Tessco (No Info) | $142,464.73 | $65,869.22 PP |
| vii. Zoll Data (No Info) | $13,122.32 | $13,122.32PP |
| viii. Global Service Solutions, Inc. (No Info.) $11,008.64 | | |

**Total payments to suppliers $815,792.95**

    c.    Payments for legal fees on account of antecedent debt:
        Cancio, Nadal & Rivera:         $19,752.95

    d.    Audit fees paid on account of antecedent debt:
        CPA. Alfredo Lopez Jiménez    $11,164.40        $4,200.00 PP

    e.    Loan payments not on the ordinary course of business
        between debtor and alleged private investors or lenders: $664,506.13

---

[2] PP- cashed made post-petition

(Mr. Jorge Rivera's check No. 8530
was cashed on September 17,2018)                                    $31,745.12PP
(Mr. Adriel Longo's Check No. 8527
was cashed on September 13, 2018)                                   $42,541.14 PP

**Total:   $1,633,726.18**

**Exhs. 8, 10-13, 18, 59, 62-69.**

15.     During the year before the Petition Date, Debtor made disbursements **to insiders**, and/or for the benefit of insiders, amounting to **$657,250.13**. See Debtor's Statement of Financial Affairs at Dkt. # 29 part 2, question # 4 and #30. The amounts disbursed included among others:

a.  Refunds to Annie Astor for advances to make Payroll    $ 124,577.16

b.  Payments to Great Lakes Corp on a student loan in the name
    of an adult son of Annie Astor who is an attorney    $3,180.96    $265.08 PP

c.  Payments to Pentagon Federal Credit Union for an auto loan
    in the name of Annie Astor    $ 7,365.36

d.  Payments to MA CPA Advisor, as compensation to
    Annie Astor    $177,912.33

e.  Bonuses paid to Annie Astor    $40,000.00[3]    35,000.00 PP

f.  Payments to Fernando Carbonell (as loan
    repayment during August and September 2018)[4]    $51,143.00    $10,056.33PP

g.  Payments to Carbonell & Co. [5]    $13,301.57    $2,322.00 PP

---

[3]   Although Skytec paid Ms. Astor a $5,000 bonus in January 2018 and a $35,000 bonus one day before the Petition Date, no contract or written corporate resolution has been produced to document any agreements to pay bonuses to professional contractors. *See* Statement of Financial Affairs, Dkt. # 29 at page 51

[4]   Fernando Carbonell is Jose Miguel Carbonell's brother.

[5]   Payments made on 8/22/2018 and 9/11/2018 on invoices dated 2015-2017 and payments for past due amounts owed by Securitrack, Prodetec and Skytrackers, Inc. (Debtor's affiliates) *See* Debtor's answer to production of documents from 341 meeting of creditors. **Exh. 16.** One of the payments also was transferred post-petition (Check No.8555 in the amount of $2,322.00, cleared on September 17, 2018.

14

| | | |
|---|---|---|
| h. Payments to Comsite (Henry Barreda) | $110,103.12[6] | |
| i. Payments to Firstbank on account of a mortgage loan under the name of Henry Barreda for real property located at Bo. Guaraguao, Bayamon, PR | $11,146.92 | |
| j. Payments to Mr. Shakill Shafique on account of a debt owed by Prodetec, Inc., (purportedly a Debtor's affiliate, and guaranteed by Mr. Henry Barreda in his personal capacity | $16,250.00[7] | $1,250.00PP |
| k. Payments to Henry Barreda (identified as salary) | $79,027.74 | |
| l. Payment of Henry Barreda's bonuses | $5,554.10 | |
| m. Payments to Firstbank on auto loans for Henry Barreda, Sandra Diaz | $17,687.87 | |
| **Total:** | **$657,250.13** | |

**Exhs. 8, 10-13, 18, 59, 62-69.**

16.     Before and after the Petition Date, the monthly compensation paid to the Debtor's

Sales Manager, Ms. Nadja Gonzalez,[8] is $8,903.14. *See* Debtor's Monthly Operating Reports

("MORs") filed at Dkt. ## 63, 66, 75, 107, 113, 134, 177, 206, 219, 228. **Exhs. 18-27.**

17.     Before and after the Petition Date, the monthly compensation paid to the Debtor's

president, Mr. Henry Barreda is $21,060.57. **Exhs. 8, 18-27.**

---

[6]     Comsite is a name under which Mr. Barreda has testified that he conducts some business. *See* **Exh. 30**.Transcript of Rule 2004 Examination at Page, 38**.**

[7]     A check for $150,416.66 appeared at the bank account reconciliation schedules included as an exhibit to the September Monthly Operating Report.  *See*, Docket No. 63 at p. 60. After LogiSYS raised the issue, Debtor has now appended copy of a check to the order of Mr. Shafique in the amount of $150,416.66 that was prepared and dated September 10, 2018, but that was then voided and not cashed. See, Dkt. # 144.

[8]     Upon information and belief, Ms. Nadja Gonzalez is Mr. Barreda's former sister-in-law.

18.     Before and after the Petition Date, the monthly compensation paid to Ms. Annie Astor (spouse of the Debtor's only other shareholder, Mr. Miguel Carbonell), the independent contractor acting as CFO is $17,327.51.  Id.

19.     These amounts collectively constitute an annual compensation of two employees and one independent contractor of $567,494.64, net of bonuses. Id.

20.     Debtor's Income Tax returns for the years 2017 through 2014 do not reflect any compensation specifically granted to Skytec's officers.  *See* Income Tax Returns **Exhs. 31-34**.

21.     Debtor has paid monthly rent of $9,175 to Mr. Barreda on real property owned by him. *See* Statement of Financial Affairs, Dkt. # 29, at 47. **Exh. 8.**

22.     Debtor has not demonstrated the necessity and reasonableness of the payment of this additional monthly compensation of $9,175 to Mr. Barreda and the benefit to the Debtor's estate, or whether any specific clients for which the use of real property at Bo. Guaraguao in Bayamón, P.R., where Skytec has antennae allegedly installed.

23.     Debtor has not provided a detailed schedule of how much it charges to its clients for such services to justify the substantial additional amount ($9,175) paid to its president. **Exhs. 18-27.**

24.     During the last 12 months before the Petition Date, as well as after the Petition Date, the $928.91 monthly payments made to Firstbank were to pay for a mortgage note over Mr. Barreda's property located at Bo. Guaraguao. **Exh. 8.**

25.     The property located at Bo. Guaraguao does not appear to be registered under Mr. Barreda's name. *See* Statement of Financial Affairs, Dkt # 29, at p. 44, October 2018 MOR, Dkt. # 66, at p. 9. *See* Mortgage Note, **Exh 46**, Copy of unsigned purchase deed, **Exh 47**. and copy of

a certificate from the Property Registrar (in the Spanish language) that does not show Mr. Barreda as the owner of the property, **Exh 48**.

26.     The auto loan paid since 2014 by Debtor on an Acura MDX 2014 is actually for the use of Ms. Sandra Iglesias, Mr. Barreda's wife. **Exh. 30** pp. 52-53.

27.     Twelve monthly payments on that auto loan in the amount of $1,164 were made during the year before the filing of the petition. The Debtor has continued making those monthly payments, even after the Petition Date. *See* MORs at Dkts. ## 63, 66, 75, 107, 113, 134, 177, 206, 219, 228. **Exhs. 18-27.**; Transcript of Mr. Henry Barreda's Rule 2004 Examination **Exh 30**, at pp. 52-53.

28.     Debtor's "compensation packages" to insiders are in excess to the industry standards in Puerto Rico. See National Bureau of Labor Statistics Occupational Employment & Wages Statistics – Puerto Rico 2018. **Exh. 49**.

29.     Debtor's 2017 financial statements disclosed no receivable from SecuriTrack in the amount of $89,946 (*see* notes 4 and 5).  *See* Debtor's Disclosure of Affiliated Entities (Item 3) produced by Debtor after the first session of Section 341 meeting of creditors. **Exh. 50 and 55**. Debtor's 2017 Financial Statements.

30.     Debtor intends to continue paying Mr. Barreda an annual, post-confirmation compensation of $239,000.  See, Amended Disclosure Statement, Dkt. # 175, at p. 25.

31.     Debtor intends to continue paying Ms. Annie Astor an annual, post-confirmation compensation of $176,000. See, Amended Disclosure Statement, Dkt. # 175, at p. 25.

32.     The amount of trade accounts receivable that are stated at p. 8 of Debtor's amended Disclosure Statement in the amount of $1,436,147, Dkt 175-6, p.8, approximates the accounts receivable reported in the MOR for the period ended September 30, 2018, in the amount of

$1,426,792 (after deducting an allowance for uncollectible accounts in the amount of $499,137.51). **Exh. 18**.

33.    The amounts used by Debtor's expert, Mr. Luis Carrasquillo in his analysis regarding accounts receivables are different from the amounts included in the Monthly Operating Reports for September and October 2018, Dkt. 69, p. 58 and Dkt 66, pp. 4 and 106. **Exhs. 18-19**.

34.    FirstBank account statement # 1409200705 described in Debtor's Monthly operating Report for September 2018 reflected payments honored by the bank during the month of September 2018 and within which several payments, issued before the filing of the petition, were honored by the bank after the bankruptcy filing. *See* Dkt. No. 29 and Dkt. No. 63. **Exhs. 8 & 18**.

35.    Skytec issued check number 8550 in the amount of $35,000, payable to Annie Astor's d/b/a M&A CPA Advisors, on September 11, 2018, which Firstbank honored on September 12, 2018. **Exhs.8, 18 & 59**.

36.    Skytec issued check number 8551 in the amount of $1,639.77, payable to Annie Astor's d/b/a M&A CPA Advisors on September 11, 2018, which Firstbank honored on September 12, 2018. **Exhs.8, 18 & 59**

37.    Firstbank honored ACH payments in favor of BPPR for payment of credit card accounts on September 12, 2018 in the amount of $22, 417.77 and $11,395.05. **Exhs.8, 18 & 59**

38.    Firstbank honored an ACH payment in favor of AMEX for payment of credit card accounts on September 12, 2018 in the amount of $2,387.69. **Exhs.8, 18 & 59**

39.    Firstbank honored ACH payments in favor of Firstbank for payment of credit card accounts on September 12, 2018 in the amount of $1,413.58 and $525.00. **Exhs.8, 18 & 59**

40. Firstbank honored an ACH payment in favor of Great Lakes for payment of a student loan for the benefit of Mrs. Astor's son on September 12, 2018 in the amount of $265.08. **Exhs.8, 18 & 59**

41. Skytec issued check number 8508, in the amount of $1,000, payable to Alfredo Jimenez, CPA on September 4, 2018. Firstbank honored the check on September 17, 2018. **Exhs.8, 18 & 59**

42. Skytec issued check number 8527 in the amount of $42,541.14, payable to Adriel Longo on September 6, 2018. Firstbank honored check 8527 on September 13, 2018. **Exhs.8, 18 & 59**

43. Skytec issued check number 8526 in the amount of $65,537.93, payable to Tessco on September 7, 2018. Firstbank honored check 8526 on September 17, 2018. **Exhs.8, 18 & 59**

44. Skytec issued check number 8530 in the amount of $31,745.12, payable to Jorge Rivera on September 6, 2018. Firstbank honored check 8530 on September 17, 2018. **Exhs.8, 18 & 59**

45. Skytec issued check number 8534 in the amount of $38,179.88, payable to MVS Leading Satellite on September 10, 2018. Firstbank honored check 8534 on September 14, 2018. **Exhs.8, 18 & 59**

46. Skytec issued check number 8543 in the amount of $13,122.32, payable to Zoll Data on September 10, 2018. Firstbank honored check 8543 on September 18, 2018. **Exhs.8, 18 & 59**

47. Skytec issued check number 8532 in the amount of $344,699.90, payable to Daniels Electronics on September 10, 2018. Firstbank honored check 8532 on September 20, 2018. **Exhs.8, 18 & 59**

48.     Skytec issued check number 8533 in the amount of $29,212.94, payable to Kenwood Comm. Corp. on September 10, 2018. Firstbank honored check 8533 on September 24, 2018. **Exhs.8, 18 & 59**

49.     Skytec issued check number 8560 in the amount of $331.29, payable to Tessco on September 12, 2018. Firstbank honored check 8560 on September 19, 2018.  **Exhs.8, 18 & 59**

50.     Skytec issued check number 8536 in the amount of $4,010, payable to REI on September 10, 2018. Firstbank honored check 8536 on September 14, 2018. **Exhs.8, 18 & 59**

51.     Skytec issued check number 8555 in the amount of $2,322.0, payable to Carbonell & Co. on September 11, 2018. Firstbank honored check 8555 on September 17, 2018.  **Exhs.8, 18 & 59**

52.     Skytec issued check number 8559 in the amount of $1,024.66, payable to Kenwood Comm. Corp. on September 12, 2018. Firstbank honored check 8559 on September 17, 2018. **Exhs.8, 18 & 59**

53.     Skytec issued check number 8540 in the amount of $3,200, payable to Alfredo Jimenez, CPA on September 10, 2018. Firstbank honored check 8540 on September 25, 2018. **Exhs.8, 18 & 59**

54.     Skytec issued check number 8542 in the amount of $1250, payable to Shakil Shafique on September 10, 2018. Firstbank honored check 8527 on September 27, 2018.  **Exhs.8, 18 & 59**

55.     Firstbank honored an ACH payment in favor of BPPR for payment of a credit card account on September 13, 2018 in the amount of $11,809.04.  **Exhs.8, 18 & 59**

56.     Firstbank honored an ACH payment in favor of Oriental Bank for payment of a credit card account on September 13, 2018 in the amount of $8,671.65. **Exhs. 8, 18 & 59**

57.     Firstbank honored an ACH payment in favor of Firstbank for payment of a credit card account on September 19, 2018 in the amount of $3,212.24. **Exhs.8, 18 & 59**

58.     There is a gap between checks paid within 90 days before filing and the checks honored by the bank within 90 days prior to filing.  *See*, Skytec, Inc. Bank account statement corresponding to June, July, and August 2018. **Exhs. 56- 59**

59.     As of December 2016, Skytec should have accounted $706,554 as an excess of debts over assets.  *See*, **Exh. 70**. Expert Report of Mr. Carlos Baralt, July 23, 2019

60.     As of December 2017, Skytec should have accounted $670,925 as an excess of debts over assets.  *See*, Id. Expert Report of Mr. Carlos Baralt, July 23, 2019.

61.     As of December 2018, Skytec should have accounted $1,586,444 as an excess of debts over assets.  *See Id.*, Expert Report of Mr. Carlos Baralt, July 23, 2019.

62.     Skytec's insolvency in 2016 is reflected upon considering the unrecorded portion of Debtor's debt to LogiSYS in the amount of $612,585 in 2016. *See Id.*, Expert Report of Mr. Carlos Baralt, July 23, 2019.

63.     Skytec's insolvency in 2017 is reflected upon considering the unrecorded portion of Debtor's debt to LogiSYS in the amount of $1,612,585 in 2017. *See Id.*, Expert Report of Mr. Carlos Baralt, July 23, 2019.

64.     Skytec's insolvency in 2018 is reflected upon considering the unrecorded portion of Debtor's debt to LogiSYS in the amount of $2,772,084 in 2018. *See Id.*, Expert Report of Mr. Carlos Baralt, July 23, 2019.

65.     The equity as of December 31, 2016 and 2017 is positive after the conversion (in 2016) of $1,905,584 of loans payable to stockholders into preferred stocks, reducing liabilities and increasing equity by $1,905,584. *See Id.*, Expert Report of Mr. Carlos Baralt, July 23, 2019.

66.     Debtor had an accumulated deficit of $1,301,553 and $1,265,924, respectively, as of December 31, 2016 and 2017, according to its audited financial statements. *See Id.*, Expert Report of Mr. Carlos Baralt, July 23, 2019.

67.     Debtor's balance sheets as of December 31, 2016 and 2017, reflect intangible assets with a book value of $2,331,191.  *See Id.*, Expert Report of Mr. Carlos Baralt, July 23, 2019.

68.     Debtor's Financial Consultant presents the fair value of intangibles as of August 31, 2018 at $519,390. *See Id.*, Expert Report of Mr. Carlos Baralt, July 23, 2019.

69.     If the decline in value is considered for the solvency analysis of 2016 and 2017, the liabilities would exceed the value of assets. *See Id.*, Expert Report of Mr. Carlos Baralt, July 23, 2019.

**B. Skytec:**

1.     Software sold by Logistic Systems was their Legacy CAD developed on a UNIX based system. Logistic Systems ended up installing their CAD Trak (Northstar remote system) because it works better in a wifi environment. However, this system did not have the capabilities of the Legacy CAD and had no RMS (Records Management Systems) capabilities. This caused significant delays from the beginning in all the projects.  In addition, lack of planning and resource utilization by Logistic Systems not only cost significant delays in the AEMEAD project, but also in the three projects that ensued. As a result, Skytec had to step up and configure the RMS system and all reports.

-     See Steven Hoover's e-mail to Hien Nguyen on 12/21/10 (one year after the AEMEAD Contract was signed). Documents # 78480, 78481 and 78483 of Logistic Systems'production.

- See Srinivas Mondava's e-mail to Carol Minjares on December 2, 2010. Document # 6293 of Logistic Systems' production.

- See e-mails between Steve Hoover and Hien Nguyen of 6/6/2010 to 6/8/2010. Documents # 6042 to 6049 of Logistic Systems' production.

- See e-mails between Hien Nguyen, Charles Stortz, Steve Hoover and Srinivas Mondava dated 4/23/2010 and 4/30/2010. Documents #6547 to 6554 of Logistic Systems' document production.

- (Testimonies of Mr. Barreda, Mr. Maldonado and/or Mrs. Astor)

2.     Two years after the AEMEAD Contract was signed, Skytec began to produce all reports that Logistic Systems was not able to produce and which Logistic Systems planned to use for their own clients.

- See e-mail from Srinivas Mondava to Dean Phillips and Robert Bowman, dated January 31, 2012. Document # 51,789 of Logistic Systems' production.

- (Testimonies of Mr. Barreda, Mr. Maldonado and/or Mrs. Astor)


3   Skytec made all payments to Logistic Systems on the main softwares, except for $357,186.00 which was pending completion of the work on PRLEDS, Metro I and Metro II.

- See e-mails between Charles Stortz, Srinivas Mondava and Arika Steele. Documents # 9700,9701 and 9702 of Logistic Systems' production.

- (Testimonies of Mr. Barreda, Mr. Maldonado and/or Mrs. Astor)

4.   Skytec paid $166,720.00 for RMS training that was never completed.

- See e-mails between Charles Stortz, Srinivas Mondava and Arika Steele. Documents # 9700,9701 and 9702 of Logistic Systems' production.

- (Testimonies of Mr. Barreda, Mr. Maldonado and/or Mrs. Astor)

5.   Logistic Systems' Charles Stortz was concerned on December 2,2013 that they would try to charge Licenses on the PR LEDS, Metro I and Metro II projects in early 2014 because none of those systems would be live.

- See e-mails between Charles Stortz, Srinivas Mondava and Arika Steele. Documents # 9700,9701 and 9702 of Logistic Systems' production.

- (Testimonies of Mr. Barreda, Mr. Maldonado and/or Mrs. Astor)

6.   On November 7, 2010, and related to the first project, AEMEAD, Skytec informed Logistic Systems it would take over the Research and Development and the Report writing in order to maintain timely fulfillment of customer expectations.

- See e-mail from Skytec's Victor Maldonado to Steve Hoover, dated November 7, 2010. Document # 14,931 of Logistic Systems' production.

- (Testimonies of Mr. Barreda, Mr. Maldonado and/or Mrs. Astor)

7.   Throughout 2011, 2012 and 2013, all four projects were delayed for various reasons, mostly due to Logistic Systems' inability to provide a product that would be adequate, lack of resources and support, among other deficiencies.

- See E-mail conversation between Srinivas Mondava and Joe Lawson, dated 10/10/2011. Document # 52053 of Logistic Systems' production.

- E-mail conversation between Joe Lawson and Srinivas Mondava, dated 1/12/2012. Document # 34596 of Logistic Systems' production.

- E-mail conversation between Srinivas Mondava and Joe Lawson, dated 3/16/2012. Document # 51210 of Logistic Systems' document production.

-    E-mail conversation between Srinivas Mondava and Steve Hoover, dated 10/04/2012. Document # 50541 of Logistic Systems' production.

-    E-mail conversation between Srinivas Mondava and Steve Hoover, dated 3/15/2013. Document # 50429 of Logistic Systems' production.

-    E-mail conversation between Srinivas Mondava and Joe Lawson, dated 3/19/2013. Document # 50397 of Logistic Systems' production.

-    E-mail conversation between Srinivas Mondava and Robert Bowman, dated 4/15/2013. Document # 50360 of Logistic Systems' production.

-    E-mail conversation between Charles Stortz and Daniel Boardman, dated 6/14/2013. Document # 9470 of Logistic Systems' production.

-    E-mail conversation between Charles Stortz, Srinivas Mondava and Hien Nguyen, dated 8/9/2013. Document # 9518 of Logistic Systems' production.

-    (Testimonies of Mr. Barreda, Mr. Maldonado and/or Mrs. Astor)

8.    Charlie Storz gave instructions to the Accounting Department at Logistic Systems on three occasions, in December of 2012, August of 2013 and October of 2013, to wait for the billing of the AEMEAD licenses, since he knew that the project was not completed.

-    See E-mail conversations between Charlie Storz, Arika Steele, Louis Jensen and Udloc Nguyen dated: 12/20.2013, 8/6/2013 and 10/19/2013.  Documents 62,543 to 62546 of Logistic Systems' production.

-    (Testimonies of Mr. Barreda, Mr. Maldonado and/or Mrs. Astor)

9.    Even when PRLEDS, Metro I and Metro II projects had not been completed, in August of 2014 Logistic Systems rushed to bill for licenses on these projects and also on the uncompleted contract items and Lois Jensen was given instructions to bill retroactively.

- See e-mails between Srinivas Mondava, Charles Stortz and Lois Jensen. Documents # 62749, 62750 and 62751 of Logistic Systems' production.

- (Testimonies of Mr. Barreda, Mr. Maldonado and/or Mrs. Astor)

10. Functional Specifications Document (FSD) was never provided as required under the contract. (See testimonies to be provided by Mr. Henry Barreda and Mr. Victor Maldonado.)

11. The FSD document is essential in these projects to do a proper project management and is mentioned in many clauses in the contracts, as a prerequisite for other tasks under the contract. (See testimonies to be provided by Mr. Henry Barreda and Mr. Victor Maldonado.)

12. Cad Calibration worksheets were never presented by Logistic to the Customer (defined in the contracts as the Commonwealth of PR) for signature. (See testimonies to be provided by Mr. Henry Barreda and Mr. Victor Maldonado.)

13. Cad was never certified "live" for Metro I, Metro II and PRLEDS projects.

14. There was no RMS Calibration testing, because there was no functional RMS for Metro I, Metro II and PRLEDS projects. (See testimonies to be provided by Mr. Henry Barreda and Mr. Victor Maldonado.)

15. There was no user training, RMS live operations, or RMS System acceptance, in any of the four projects, because there was no Functional RMS provided by Logistics. (See testimonies to be provided by Mr. Henry Barreda and Mr. Victor Maldonado.)

16. Given Logistics' inability to comply with its responsibilities under the PRLEDS, Metro I and Metro II projects, Skytec filed a complaint against Logistics that was later removed to the District Court.  (See testimonies to be provided by Mr. Henry Barreda and Mrs. Annie Astor.)

17. Even after Skytec's experts where disallowed, Skytec understood, and its counsel so stated, that Logistics could not be successful in its counterclaim because it never completed the

PRLEDS, Metro I and Metro II projects.  (See testimonies to be provided by Mr. Henry Barreda and Mrs. Annie Astor.)

18.     Up until the District Court Order was entered, Skytec was under the impression that any judgment in favor of Logistics would not include payment for licenses for the PRLEDS and Metro I projects since these projects were never completed and/or went "live".  In addition regarding the first project, AEMEAD, Skytec understood that any judgment in favor of Logistics for these licenses would be reduced by the funds that Skytec had to incur to conclude this first project.  (See testimonies to be provided by Mr. Henry Barreda and Mrs. Annie Astor.)

19.     The motion filed by Skytec's attorney on July 31, 2017 at Docket No. 75, was never consulted with Skytec and is contrary to what Skytec's attorney had been telling Skytec regarding its chances to succeed in the case.  (See testimonies to be provided by Mr. Henry Barreda and Mrs. Annie Astor.)

20.     The mismanagement of the case by Skytec's attorney in the District Court was not known to Skytec until after the bankruptcy petition was filed. (See testimonies to be provided by Mr. Henry Barreda and Mrs. Annie Astor.)

21.     Skytec was solvent at all times before the bankruptcy petition was filed and when the alleged avoidance payments were made.   (See CPA Luis Carrasquillo's report and his testimony.)

22.     If the Court decides that Debtor was insolvent when the alleged avoidance payments were made, only the payments listed in Exhibit Z to CPA Carrasquillo's report may be considered avoidable.  (See CPA Luis Carrasquillo's report and his testimony.)

23.     If the Court decides that Debtor was insolvent when the alleged avoidance payments were made, Skytec agrees to commence the avoidance actions for the payments listed in Exhibit Z to CPA Carrasquillo's report.  (See CPA Luis Carrasquillo's report and his testimony.)

24.     Skytec's revenues and collections are very cyclical, especially during the last three (3) years, where approximately 30% of its revenues depended on three (3) governmental contracts, collections which are usually performed during the last quarter of each year. (See CPA Luis Carrasquillo's report and his testimony.)

25.     Due to the lack of normal financing agreements with local financial institutions (i.e. line of credits, short term loans, etc.), each time Debtor is granted with a special project, it needs to obtain funds, cash advances, or loans from private investors or lenders, with special terms of repayment.  (See CPA Luis Carrasquillo's report and his testimony.)

26.     Likewise, Debtor has reached agreements with a small group of suppliers that agreed to receive their payments, when Debtor receives funds and/or collections from its clients, at the completion or delivery of any specific special project. (See CPA Luis Carrasquillo's report and his testimony.)

27.     As a result, Debtor's ordinary course of business was and is to pay its private lenders' loans and certain accounts payable based on its collections cycle, to wit, immediately after performing the collections from any special project or when the governmental agencies contracts revenues are collected.  (See CPA Luis Carrasquillo's report and his testimony.)

28.     During 2018 and after the passage of Hurricane Maríia over the Island, a very extraordinary situation, the Puerto Rico Emergency Management Administration determined that Debtor was the only company capable of performing the reconstruction project of government interoperability emergency systems in an expeditious and cost-effective manner, due to its

expertise, experience, surveys of the Island, the exclusivity with various brands and equipment suppliers, among other factors.  (See Exhibit A of CPA. Carrasquillo's report and his testimony).

29.    Such special projects for the replacement of the mobile radio communications infrastructure of (i) the PR Emergency Management Administration ("PREMA" or "AEMEAD") and of (ii) the Medical Emergencies Agency, produced gross revenues of $2,418,000.  (See CPA Luis Carrasquillo's report and his testimony.)

30.    However, for the completion of the same, certain loans from private lenders and special arrangements with suppliers were needed to purchase the equipment, materials, etc., necessary for the same and to pay the incremental costs involved in the projects. (See CPA Luis Carrasquillo's report and his testimony.)

31.    This was an extremely different situation that required an expeditious process to assure the restoration of the most important system in Puerto Rico for saving lives, emergency management, and security communications.   (See CPA Luis Carrasquillo's report and his testimony.)

32.    In general terms the agreements called for loans or accounts repayments, when the projects were delivered, and the funds from the same were collected, from the different agencies. (See CPA Luis Carrasquillo's report. and his testimony)

33.    90% of the payments made during the 90 days prior to the filing date were in accordance with such terms, converting this pattern in Debtor's ordinary course of business or inclusive, receiving contemporaneous exchange of value. (See CPA Luis Carrasquillo's report and his testimony.).

34.    Skytec's bankruptcy counsel answered Logistics' request for the filing of avoidance actions through email dated February 8, 2019, wherein it was affirmed that Debtor was solvent

during when the subject payments were made, were not payments for antecedent debts, and were made in the ordinary course of business.  (See E-mail from Mr. Alexis Fuentes dated February 8, 2019; and testimonies of Mr. Barreda and/or Mrs. Astor.)

35.    Mr. Fuentes' email was never answered, and only after Skytec filed a motion requesting the disqualification of Logistic's vote was that Logistics filed its request for the appointment of a Chapter 11 Trustee. (Judicial knowledge of the motions filed; and testimonies of Mr. Barreda and/or Mrs. Astor)

36.    Debtor amended the 480.6A Form to M A CPA Advisor for the year 2018 in order to correctly state that the payment of $35,000 was for commissions. (See Amended 480.6A Form; and testimonies of Mr. Barreda and/or Mrs. Astor)

37.    The RMS sold by Logistics to Skytec was designed for small projects and it was not compatible with a larger project like the AEMEAD, PRLEDS, Metro I and Metro II projects. (See E-mails between Srinivas Mondava and Hien Nguyen dated 4/5/2014 and 4/4/2014. Documents # 78006 and 78007of Logistic Systems' production; and testimonies of Mr. Barreda and/or Mr. Maldonado)

38.    As late as October 30, 2014 the PRLEDS, Metro I and Metro II projects had not been completed and the system had not been declared "live".  (See e-mails between Victor Maldonado, Michael Waite, Daniel Boardman, and Srinivas Mondava dated 10/30/2014 and 10/29/2014.  Document # 77229 of Logistic Systems' production; and testimonies of Mr. Barreda and/or Mr. Maldonado.)

### III.    PROPOSED CONCLUSIONS OF LAW

**A. Movant LogiSYS**

**1. The Debtor's Prepetition Misconduct Constitutes Cause to Appoint a Trustee.**

Section 1104(a)(1) of the Bankruptcy Code describes the grounds for appointment of a Chapter 11 Trustee broadly under the umbrella of "for cause, including fraud, dishonesty, incompetence, or gross management of the debtor by current management," which may include conduct occurring "either before or after the commencement of the case," as well as "for similar cause." *See* 11 U.S.C. § 1104(a)(1). Under the plain meaning of the statutory text, the Debtor's extreme misconduct as adjudged by the District Court in pre-petition litigation leading up to (and directly resulting in) the Debtor's bankruptcy constitutes "cause" to appoint a Chapter 11 Trustee.

**Indeed, courts have held that a debtor's discovery misconduct constitutes "cause" to appoint a Chapter 11 Trustee.** *See, e.g.*, *Ngan Gung Rest. v. Official Comm. of Unsecured Creditors of Ngan Gung Rest. (In re Ngan Gung Rest.)*, 195 B.R. 593, 599 (S.D.N.Y. 1996) (upholding bankruptcy court's appointment of a trustee because debtor's discovery misconduct in the bankruptcy case constituted  "cause" under Section 1104(a)(1)); 7 Collier on Bankruptcy ¶ 1104.02 (16th ed. 2019) ("The court may not use the appointment of a trustee as a sanction for discovery misconduct, although **such misconduct may itself provide cause under section 1104(a)(1) for the appointment.**") (emphasis added). The mere fact that a debtor's discovery misconduct occurred pre- or post-petition is irrelevant to the determination that such misconduct may constitute cause to appoint a trustee. *See In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("[T]he Code is clear that the pre-petition conduct of the debtor's management may be the sole deciding factor" in appointing a Chapter 11 Trustee); *see also Tarquinio v. Tarquinio (In re Tarquinio)*, Civ. Action No. 17-cv-01917 (PGS), 2017 U.S. Dist. LEXIS 194421, *13 (D.N.J. Nov. 27, 2017) (upon a motion to convert to chapter 7 under 11 USC 1112(b) or appoint a trustee under Section 1104(a)(1), affirming that debtor's misconduct in pre-

petition litigation, including violations of discovery orders, constituted "cause" under Section 1112(b)).

In its Opposition, the Debtor does not cite any case law to support its argument that pre-petition litigation misconduct does not constitute "cause." The Debtor also fails to cite any case law that may hold that the Court's finding of such cause must be based on post-petition bankruptcy-related conduct. Indeed, the Debtor cites no authority at all on this point.

Instead, without a hint of irony, the Debtor's sole response is that LogiSYS has not cited a case that is *singularly and exactly* on point—*i.e.*, a case finding cause solely based on pre-petition discovery misconduct, where such misconduct was allegedly "due to Debtor's prior legal representation." (Debtor's Opp. at 8). The Debtor's empty response reveals the weakness of its position. The case law shows that the Debtor's "extreme misconduct," *see, e.g.*, District Court Order, Civil Dkt. # 160, at p. 4 ("Skytec has committed extreme misconduct not only by flouting the district court's scheduling orders but also by willful indifference to LogiSYS's attempts to coordinate discovery, and persistent refusals to produce documents in its possession."); *id*. at p. 9 ("Skytec's misbehavior and obstructionism during the discovery process has been extensive."), and ensuing attempt to escape the consequences thereof by abusing the bankruptcy process clearly constitutes cause to appoint a Chapter 11 Trustee.

### 2. The Debtor's "Compensation" to Insiders Constitutes Cause to Appoint a Trustee.

Curiously, the Debtor attempts to rebut LogiSYS's argument that the Debtor made potentially avoidable fraudulent transfers and paid excessive compensation to its insiders by asserting that such transfers were "compensation" and "already disclosed." *See* Debtor's Opp. at 5–6. The Debtor's mere disclosure of transfers or characterization of them as compensation does not, *ipso facto*, inoculate them from scrutiny as potentially avoidable transfers or evidence of gross

mismanagement. Nevertheless, the Debtor attacks LogiSYS's argument as "mind blowing" and supports this hyperbole by citing absolutely no legal authority of any kind. Opp. at p. 10. The Debtor doth protest too much.

To the contrary, case law—including cases previously cited by LogiSYS—is clear that excessive compensation, including otherwise questionable payments to insiders, may constitute excessive compensation or gross mismanagement constituting cause to appoint a trustee under Section 1104(a). *See In re Boineau's, Inc.*, No. 90-1165, 1992 U.S. App. LEXIS 3447, at *1-2 (4th Cir. Mar. 3, 1992) (affirming appointment of trustee under Section 1104(a) based on gross mismanagement founded on, *inter alia*, "excessive salaries"). Here, the Debtor characterizes numerous non-salary transfers to or for the benefit of insiders as reimbursements or part of their "compensation."  Now characterized as compensation packages, but without a single written document to prove that the amounts paid are in accordance to the standards of the industry in Puerto Rico for that type of entity.

As one example, in addition to regular salary, the Debtor characterizes certain monthly payments in excess of $10,000 to Mr. Barreda, d/b/a Comsite, as part of his "compensation," as opposed to rent for the use of Mr. Barreda's real property.[9] *See In re Sharon Steel Corp.*, 86 B.R. 455, 461, 465 (Bankr. W.D. Pa. 1988) (finding "gross mismanagement and cause for appointing a trustee under § 1104(a)(1) and § 1104(a)(2)" because, *inter alia*, "compensation was excessive,

---

[9]      In the Opposition, the Debtor insists that it has clearly and always characterized these transfers as part of Mr. Barreda's compensation. The Debtor complains that any confusion as to the nature of these particular transfers is attributable to LogiSYS, though the Debtor finds it necessary to expound at length on why and when the Debtor (in its Schedules) and Mr. Barreda (at the 341 Meeting of Creditors) have at various times for various reasons described these same transfers as "rent" for the use of Mr. Barreda's property. See Dkt. 29, p. 47. To the extent any of the Debtor's waters seem muddy to LogiSYS or the Court, it is because they can see only that which the Debtor has provided.

and possibly recoverable as fraudulent conveyances"). The Debtor also admits that as part of Mr.

Barreda's "compensation," the Debtor purchased and pays for two cars for the personal use of Mr.

and Mrs. Barreda.[10] *See* Opp. at p. 16. *See In re N. Am. Commc'ns, Inc.*, 138 B.R. 175, 179 (Bankr.

W.D. Pa. 1992) ("excessive" compensation and reimbursements which officers paid themselves,

and various vehicles purchased for their and their families' use, without any way to determine

extent to which such vehicles were used for business or personal purposes, were indicative of

"gross mismanagement" warranting appointment of trustee under Section 1104(a)).

That such transfers were disclosed, as was *required* of the Debtor, does not affect the Section

1104(a) analysis. And the Debtor's repeated emphasis that these transfers are "**not** in addition to

the compensation already disclosed," Opp. at p. 6–7, is at odds with what LogiSYS alleged and

argued in the Motion. Specifically, "[A]s presented in the monthly operating reports, the monthly

compensation for Mr. Barreda is $21,060.57." *See* Mot. at 6; *accord* Dkt. # 113 (January 2019

Monthly Operating Report ("MOR"), listing the aforementioned transfers in addition to Mr.

Barreda's monthly salary of $7,490.48). Indeed, that is the point. The reason that Mr. Barreda's

salary is an *excessive* $21,060 per month and indicative of gross mismanagement is precisely

---

[10]    On review of the audio from the 341 Meeting of Creditors, Mr. Barreda testified that Mr.
Carbonell drives a Ford Edge. Counsel for LogiSYS misheard and mistook Mr. Carbonell's Ford
for the Debtor's scheduled Ford F-250, for which the Debtor also listed its associated loan
payments to First Bank as being "to or for the benefit of an insider." *See* Dkt. # 29 at p.44. LogiSYS
regrets the error.

In Exhibit B to its Opposition, discussing payments to creditors for the benefit of insiders, the
Debtor avers that its listed auto loan payments to First Bank "includes payments for two autos for
Mr. and Mrs. Barreda's use, as part of Mr. Barreda's compensation, and a first payment of
$1,003.00 for the Ford F-250 acquired for the company's installation of communications
equipment in the mountain sites throughout Puerto Rico." *See* Opp. at Ex. B p.5 and 16. The
disclosed existence of such payments notwithstanding, the identity of the insider (if any) who
benefitted from the Debtor's payments on the Debtor's loan obligation associated with the Debtor's
Ford F-250 is unclear.

because they are transfers of assets for personal use, are excessive, and possibly recoverable as fraudulent conveyances.

### 3. Supplementary Information Required with income tax returns applicable to businesses with volume of business of $3,000,000 or more:

On December 25, 2013, Puerto Rico Act No. 163 was enacted, making significant changes to the audited financial statements' requirements for supplementary schedules ("Act 163-2013"). Act 163-2013 amended Section 1061.15[11] of the Puerto Rico Internal Revenue Code of 2011 ("PR Code") to require certain supplementary information "*to be submitted with its income tax return, underlying to the financial statements and other records used to prepare the financial statements and submitted to the audit procedures applied in the audit of the financial statements made by a certified public accountant…*" (Cited in part)

Starting with taxable years commencing after December 31, 2012, certain supplementary information is required to be submitted as part of the audited financial statements required to accompany the filing of income tax return of businesses with a business volume in excess of $3 million. Section 1061.15 of the PR Code, provides a list of the supplementary information required to be submitted, which includes in its subsection (I) the following: "*for all taxpayers, amount of wages reported on form 499R2/W2PR, as well as other payments, reimbursements or compensations to owners, shareholders, partners or members, including payments made on their behalf, if any*". On the other hand, subsection (e) of Section 1061.15 provides that "*the Secretary shall establish by regulation, circular letter, informative bulletin or administrative determination of a general character, the applicability and effectiveness of the provisions of this Section.*"

---

[11] 13 LPRA 30255.

On March 6, 2014, the Puerto Rico Treasury Department ("PRTD") issued Administrative
Determination 14-06 ("AD 14-06") with a guide for the preparation of the Supplementary
Information Report.  AD 14-06 mentioned that Schedule 19 of the Supplementary Information
Report must include: "*amount of wages reported on form 499R2/W2PR, as well as other
payments, reimbursements or compensations reported on forms 480.6A and 480.6B <u>to owners,
shareholders, partners or members</u>, including payments made on their behalf, if any. This
Schedule shall include the amounts reported as wages/salaries, commissions, allowances,
reimbursements or any other type of compensation paid to the owners, shareholders, partners
or members with 25% participation or more in the entity that makes the payment.  The Schedule
shall only include the amounts reported in form 499R2/W2PR or forms 480.6A and 480.6B filed
within the audited accounting period. The information shall be detailed and separated for each
of the shareholders, partners or members.*" (Emphasis ours)

This is the example provided in AD 14-06 for Schedule 19:

| <u>Schedule 19</u> | **Salaries reported on Form 499R-2/W-2PR and/or other payments, reimbursements or compensation reported on Forms 480.6A or 480.6B to the owners, shareholders, partners or members with a 25% participation or more** |

| Description | Last 4 digits of SSN or complete EIN | Salaries reported on Form 499R/W-2PR | Other compensation reported on 480.6A or 480.6 | Other payments, reimbursements or compensations to the owners, shareholders, partners or members with a 25% or more participation | Total |
|---|---|---|---|---|---|
| Name of Person | XXX-XX-1234 | $ XXX | $ XXX | $ XXX | $ XXX |
| Name of Entity | 66-1234567 | XXX | XXX | XXX | XXX |

A taxpayer may deduct reasonable compensation for personal services "actually rendered"

for him in connection with his trade, business, or profession or in connection with his "nonbusiness

activities". Section 1031.01[12] of the PR Code provides, in its pertinent part, that in computing net

income there shall be allowed the following deductions: "*(1) trade or business expenses, as*

*provided in section 1033.01, which had not been claimed as a deduction against adjusted gross*

*income*". On the other hand, section 1033.01[13] of the PR Code provides that "t*here shall be*

*allowed as deduction all the ordinary and necessary expenses paid or incurred during the taxable*

*year in carrying on any trade or business, including: (1) a reasonable allowance for salaries or*

*other compensation for personal services actually rendered.*" Employers who at the time of filing

the income tax return have not remitted to the PRTD the full amount of income tax withheld from

employees' salaries for the year covered by the return, may not deduct such salaries as operating

expenses.

Only a "reasonable" compensation for personal services is deductible by an employer.  In

summary, "reasonable" has been defined as "the amount that would ordinarily be paid for like

services by like enterprises under like circumstances." Article 23(a)-6 of the Puerto Rico Income

Tax Act of 1954 Regulation[14] provides as follows:

(a) "There may be included among the ordinary and necessary expenses paid or incurred in carrying
on any trade or business a reasonable allowance for salaries or other compensation for personal
services actually rendered. ***The test of deductibility in the case of compensation payments is
whether they are reasonable and are in fact payments purely for services***.

---

[12] 13 LPRA 30101.

[13] 13 LPRA 30121(a)(1).

[14] P.R. ITA Reg. Art. 23(a)-6. Article 23(a) of the Regulations issued under the Puerto Rico Income
Tax Act of 1954, as amended (the "P.R. ITA Reg."). Please note that Section 23(a) of the
ITA is equivalent to Section 1033.01(a) of the PR Code.  As such, pursuant to Section
6091.01(a)(1) of the PR Code, all regulations adopted by virtue of the 1994 Code, or any
previous tax act, shall continue in full force and effect until the regulations under the PR
Code are issued, provided said regulations correspond to the provisions of the PR Code
that are identical to the corresponding provisions in said Acts.

(b) The test set forth in paragraph (a) of this article and its practical application may be further stated and illustrated as follows:

(1) Any amount paid in the form of compensation, but not in fact as the purchase price of the services, is not deductible. **An ostensible salary paid by a corporation may be a distribution of a dividend on stock**. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. **If in such a case the salaries are in excess of those ordinarily paid for similar services, and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are distribution of earnings upon the stock.** An ostensible salary may be in part payment for property. This may occur, for example, where a partnership sells out to a corporation, the former partners agreeing to continue in the service of the corporation. In such a case it may be found that the salaries of the former partners are not merely for services, but in part constitute payment for the transfer of their business.

(2) …

(3) ***In any event the allowance for the compensation paid may not exceed what is reasonable under all circumstances***. ***It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances.*** The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned." (Emphasis ours)

With regards to the treatment of excessive compensation, Article 23(a)-7 of the Puerto Rico Income Tax Act of 1954 Regulation[15] provides as follows:

"The income tax liability of the recipient in respect of an amount ostensibly paid to him as compensation, but not allowed to be deducted as such by the payor, will depend upon the circumstances of each case. Thus, **in the case of excessive payments by corporations, if such payments correspond or bear a close relationship to stock holdings and are found to be a distribution of earnings and profits, the excessive payments will be treated as a dividend**. If such payment constitute payment for property, they should be treated by the payor as a capital expenditure and by the recipient as part of the purchase price. In the absence of evidence to justify other treatment, excessive payments for salaries or other compensation for personal services will be included in gross income of the recipient and subjected to both normal tax and surtax." (Emphasis ours).

In conclusion, in order to ascertain whether any compensation paid to the shareholders or members of the entity is excessive, all the circumstances surrounding the entity and the industry's standards must be analyzed. If it is concluded that the compensation paid is excessive, then the

---

[15] P.R. ITA Reg. Art. 23(a)-7. Article 23(a) of the Regulations issued under the Puerto Rico Income Tax Act of 1954, as amended (the "P.R. ITA Reg."). Please note that Section 23(a) of the ITA is equivalent to Section 1033.01(a) of the PR Code. Refer to footnote 4 above.

company should not be allowed to deduct the whole compensation as an expense for income tax purposes and the amount determined as excessive should be recharacterized as a dividend or distribution to the shareholder or member, which is not deductible as an expense.

**4.The Debtor's Failure to Pursue Avoidance Actions Constitutes Cause to Appoint a Trustee.**

As the cases cited above, in the Motion, and in LogiSYS's Plan Objection suggest, transfers of purported "compensation," for which the Debtor does not receive reasonably equivalent value or that are intended to hinder or delay other creditors, present colorable claims for avoidance as actually or constructively fraudulent. In addition to constituting gross mismanagement in their own right, the Debtor's failure to pursue actions to avoid those transfers further constitutes cause to appoint a Chapter 11 Trustee.

Here, the Debtor does not acknowledge or even mention the existence of colorable potential fraudulent conveyance actions to avoid these transfers. Indeed, the Debtor appears to be operating under the mistaken view that "the compensation paid to [the Debtor's] officers . . . is not a transfer of asset[s]." Opp. at p. 10. It manifestly is. *All* payments by a debtor, whether for compensation (in the form of salary or otherwise) or anything else, are transfers of the Debtor's assets. That is why courts may find such payments colorably avoidable as fraudulent *transfers* constituting cause to appoint a Chapter 11 Trustee.

Courts rightly view transfers to insiders, whether purported to be "compensation" or "loan repayments" with heightened scrutiny, particularly where there is no written documentation of the underlying obligation. Debtor did not produce any documents to LogiSYS evidencing these purported compensation obligations because, according to the Debtor, there are "none." *See* Obj. to Amended Disclosure Statement at p. 14. Likewise, the Debtor has failed to produce

documentation of loans by Mr. Shafique or Ms. Astor to or for the benefit of the Debtor. *See id.* at 11–13. As discussed at length in LogiSYS's Objection to Amended Disclosure Statement, courts have found that such purportedly undocumented "loans" or non-salary "compensation" arrangements should be recharacterized as gifts or equity and avoided, along with any payments thereon, as actually or constructively fraudulent. *See id.* at 11–17 (analyzing potential recharacterization and avoidance of the Debtor's "loan" and "compensation" payments to insiders). And, as discussed in the Plan Objection and the Motion, the Debtor-in-possession, being controlled by the very insiders who would be the target of such actions, is hopelessly biased and conflicted and cannot be relied upon pursue actions to avoid fraudulent transfers to its insiders and affiliates.

Nor does the Debtor's Amended Disclosure Statement adequately explain or justify the Debtor's refusal to pursue avoidance actions with respect to potential preference actions. The Amended Disclosure Statement and the Opposition merely rely on the letter previously provided by the Debtor declining to pursue avoidance of preferential transfers. As a response to the Motion, however, the Debtor's pro forma amendments to the Disclosure Statement and reliance on its prior letter fall woefully short.

As LogiSYS previously explained in the Plan Objection, the Debtor appears to misunderstand the fundamental elements and nature of preference law. Specifically, first, the Debtor mistakenly asserts that a preference depends on the existence of a *past due* debt. In truth, a preference requires only an *antecedent* debt, which is merely an existing debt, including a debt that is not yet due. *See* Plan Obj. at 25–27. Second, and related, whether a debt is paid when due may be a factor, but is not dispositive of, the availability of an *affirmative defense* that payment was made in the ordinary course, but that has nothing to do with whether the elements of a claim for preference may

colorably be asserted. *See id.* at 27–28. Moreover, the Debtor's assertions that such transfers were "made according to contractual terms", Opp. at 9, cannot be credited given that the Debtor also insists that there are no documented agreements (e.g., for "compensation" to various insiders) or has failed to produce documented agreements (e.g., supporting "loans" from insiders such as Ms. Astor) supporting such payments.

Third, for purposes of preference law, the Debtor was presumptively insolvent during the 90 days before the Petition Date. *See id.* at 27; Obj. to Amended Disclosure Statement at 17–18. It is the Debtor's burden to show otherwise, and that burden is not carried by the Debtor's mere assertion to the contrary.

A debtor is insolvent when its debts exceed its assets - the "traditional bankruptcy balance sheet test." *In re Koubourlis,* 869 F.2d 1319, 1321 (9th Cir. 1989). This test is codified at § 101(32)(A), which defines insolvency to mean: "with reference to an entity other than a partnership and a municipality, financial conditions such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation" exclusive of certain exempted or fraudulently transferred property. Under the Code, the term debt "means liability on a claim." 11 U.S.C. § 101(12). And the term "claim" is defined under the Code to include "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; . . . ." *DC Media Capital, LLC v. Imagine Fulfillment Servs., LLC (In re Imagine Fulfillment Servs., LLC) 2014 Bankr. LEXIS 3369 (B.A.P 9TH Cir. 2014)*

A court determines a debtor's insolvency based on "a fair valuation" of the debtor's assets and liabilities, employing a two-step analysis. *Id*. First, the court determines whether the debtor was a "going concern" or "on its deathbed." *In re DAK Indus., Inc., 170 F.3d 1197, 1199 (9th Cir.*

1999). Second, "the court must value the debtor's assets, depending on the status determined in the first part of the inquiry, and apply a simple balance sheet test to determine whether the debtor was solvent." *Id.* (citation omitted). The fair value of assets belonging to a "going concern" debtor is "the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." *Id.* at n.3. In contrast, a fair valuation of a debtor "on its deathbed" is the liquidation value of the debtor's assets. Id. *Imagine Fulfillment Services, LLC, vs. Dc Media Capital, LLC, (In re: Imagine Fulfillment Services, LLC),* 489 B.R. 136 Bankr. C. California 2013) [Amended Memorandum for publication]

In Perez v. Bui (In re Tenorio), No. CC-17-1102-FLKu, 2018 Bankr. LEXIS 456, at *24-25 (B.A.P. 9th Cir. Feb. 8, 2018**)** citing In re Sierra Steel, Inc., 96 B.R. 275, 279 (B.A.P 9th Cir. 1989). the bankruptcy appellate panel held:

> [a] claim, **even if disputed,** is nevertheless a "debt" for the purposes of considering a debtor's insolvency:
> To the extent the bankruptcy court refused to consider the $300,000 claim only because it was a disputed or unliquidated claim, its determination was erroneous. A "debt" is defined as liability on a claim. 11 U.S.C. § 101(11). A claim includes a right to payment, even if it is contingent, unmatured, or not reduced to judgment. 11 U.S.C. § 101(4A). Since claims may be disputed or contingent, disputed or contingent liabilities must be included in determining total indebtedness for purposes of determining insolvency. See 2 Collier on Bankruptcy ¶ 101.31[5].

Courts have also determined that "There is no generally accepted accounting principle for analyzing the insolvency of a company." *Arrow Elecs., Inc. v. Justus (In re Kaypro),* 218 F.3d 1070, 1076 (9th Cir. 2000) (citing *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.),* 96 B.R. 275, 278 (9th Cir. BAP 1989)). GAAP are not controlling. *See In re Sierra Steel, Inc.,* 96 B.R. at 278. In particular, "[w]ith regard to the sum of [a debtor's] debts, GAAP are . . . inapposite because they do not report liabilities in accordance with the right to payment standard of 11 U.S.C. § 101(5) and (12*).''Devan v. The CIT Group/Commercial Servs., Inc. (In re Merry-Go-Round Enters., Inc.),*

229 B.R. 337, 343 (Bankr. D. Md. 1999). *DC Media Capital, LLC v. Imagine Fulfillment Servs., LLC (In re Imagine Fulfillment Servs., LLC) 2014 Bankr. LEXIS 3369 (B.A.P 9TH Cir. 2014)*

In *Barnhill v. Johnson*, 503 U.S. 393 (1992) the US Supreme Court held that, in determining whether a transfer occurred within the 90-day preference period of 547(b)(4)(A), a transfer by check is deemed to occur on the date the drawee bank honors the check, because (1) there is no unconditional transfer of the debtor's interest in property prior to the date the check is honored; (2) only when the debtor has directed the drawee bank to honor the check, and the bank has done so, has the debtor implemented a "mode, direct or indirect … of disposing of property or an interest in property" within the definition of a transfer in *11 USCS 101(54)*; (3) having received the check gives the creditor at most a chose in action against the debtor, which cannot fairly be characterized as even a "conditional" right to property or an interest in property under 101(54); (4) the date-of-honor rule is consistent with *11 USCS 547(e)(2)(A)*--which provides that a transfer occurs at the time the transfer takes effect between the transferor and the transferee--as the transfer of funds cannot be said to take effect until the moment of honor, particularly where the transferor retains the ability to stop payment on the check until the very last; and (5) no support for a different rule is provided by statements by members of Congress that payment is considered to be made when the check is delivered for purposes of the preferential transfer avoidance exceptions of *11 USCS 547(c)(1)* and *547(c)(2)*.

In *Lewis v. Kaelin* (*In re Cresta Tech. Corp.*), 583 B.R. 224 (B.A.P. 9th Cir. 2018) the Bnakruptcy Appellate Panel for the 9th Circuit noted that a bankruptcy filing before a check is honored is very different from a transaction in which the payment was actually completed prepetition; the transaction is incomplete for not having been paid due to the account now belonging to the bankruptcy estate. Therefore, neither the § 547(b) nor the affirmative defenses

available under § 547 (c) apply. The BPA holding affects any case where the Debtor delivers ordinary checks prior to the petition date that are subsequently honored post-petition.

The Southern District of Florida held in *Mukamal v. Enriquez (In re Rx Cardiovascuar Specialties, Inc.) 355 B.R. 873, 2006, citing Lawrence v. Bonadio, Insero & Co., et al. (In re Interco Systems, Inc.),* 202 B.R. 188 (Bankr. W.D. N.Y. 1996) that section 549 does not contain an exception for ordinary course of business payments because there is no debtor's business once a petition has been filed, creating an estate under section 541 and a new entity, the debtor-in-possession, to manage that estate). Also cited *Celendenen v. Van Dyk Oil Co., Inc. (In re By-Rite Distributing, Inc.),* 89 B.R. 906 (D. Utah 1988) where the court found that the contemporaneous exchange defense to preference action inapplicable in defense of a section 549 post-petition transfer. The bankruptcy court in Florida pointed out that there does not appear to be any case in which a court found that defenses available under 11 U.S.C. § 547 are available to an action to avoid a transfer pursuant to 11 U.S.C. § 549. "Congress, by enacting the ordinary course of business exception to an avoidable preference in Section 547(c)(2), has demonstrated that it is aware of and capable of enacting such an exception when it feels that it is appropriate. However, Congress has elected not to enact such an exception with respect to post-petition transfers …." *In re Interco Systems, Inc.,* 202 B.R. at 192, *Mukamal v. Enriquez (In re Rx Cardiovascuar Specialties, Inc.) 355 B.R. 873,875, 2006.*

This court has followed the interpretations on avoidance of post-petition transfers. In *Correa v. P.R. Treasury Department*, 206 Bankr. LEXIS 2383 (2016) this bankruptcy court indicated that under section 549(a), the trustee "may avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . that is not authorized under this title or by the court. 11. U.S.C. § 549(a). "To satisfy the elements of § 549(a), the debtor in possession must demonstrate

that, 1) after the commencement of the bankruptcy case in question, 2) property of the estate 3) was transferred, and 4) the transfer was not authorized by the Bankruptcy Court or by a provision of the Bankruptcy Code." Citing *ETS Payphones, Inc. v. AT&T Universal Card (In re PSA, Inc.)*, 335 B.R. 580, 584-85 (Bankr. D. Del. 2005).

### 5. The Debtor's Self-Dealing Plan Is Unlawful and Constitutes Cause to Appoint a Trustee.

The Debtor's casual approach to its financial wherewithal, depending on the circumstance, also serves to illustrate the Debtor's bad faith proposal of the Plan and its irretrievable failure to comply with Bankruptcy Code. The Debtor's bald assertion that its Plan "complies with all the provisions of the Bankruptcy Code," turns a deaf ear to the undisputed rights of unsecured creditors and obligations of a debtor-in-possession.

As explained in LogiSYS's Plan Objection, the Plan (a) violates the absolute priority rule, (b) was not proposed in good faith, (c) includes a tainted liquidation analysis, (d) is of dubious feasibility, and (e) purports to impair a class of claims that cannot even vote on the Plan. *See generally* Plan Objection. The Amended Disclosure Statement does not cure these defects. The Opposition fails to engage them. And even the Debtor's reply (Dkt. # 145) to the Plan Objection offers no substantial reply beyond an erroneous analysis of the absolute priority rule.

### 6. The appointment of a Trustee is Necessary Because the Debtor is Incapable of Fulfilling its Fiduciary Duties to Creditors.

For all of the reasons discussed above and in LogiSYS's Motion, the Debtor's contentions that it has fulfilled, or can be trusted to fulfill, its fiduciary duties to its estate and creditors of its estate are incomplete and do not hold water. The Debtor holds up the mere "disclosure" of questionable transactions and dubious self-serving assertions that creditors will receive more under the Plan than in a liquidation as though they were talismans capable of redeeming those transactions and

the Plan ratifying them of their otherwise congenital defects. If only it were so. Far from establishing the Debtor's bona fides as a fiduciary in bankruptcy, the Debtor's aggressively myopic view of the law and its own obligations thereunder further demonstrates that a Chapter 11 Trustee must be appointed. And the Debtor's view of the acrimony that has unfortunately been perpetuated through the conduct of its bankruptcy case only emphasizes the need.

The Debtor asserts that the case law cited for LogiSYS's "[i]ncredibl[e]" attempt at justifying the appointment of a trustee based on "the acrimony that exists between Debtor and Logistics" is "inapposite" because, in the instant case, "the only creditor that had and/or has an animosity with Debtor is Logistics." Debtor's Opp. At 11-12. The Debtor does not discuss or even cite any cases, not even the cases it claims are inapposite or provoke incredulity, leaving the reader to speculate. Closer inspection reveals the Debtor's response to be meritless.

First, LogiSYS *is* the only substantial third-party unsecured creditor in this case. Second, the Debtor's suggestion that there must exist acrimony between a debtor and all (or at least multiple) creditors in order for such acrimony to support the appointment of a trustee under a 1104(a)(2) is wholly unsupported. LogiSYS is not aware of any authority to support this proposition and the Debtor, again, fails to cite any authority whatsoever.

In fact, authority to the contrary exists, including the very case law cited by LogiSYS, *see* Motion at 21, 24, which the Debtor self-admittedly "does not refute," *id*. at 10. These cases are directly on point and make clear that grounds for appointment of a trustee may be founded upon the acrimony of a debtor and some (but not all) creditors or even a single creditor, including where that acrimony results from the debtor's misconduct in discovery disputes. *See In re Taub*, 427 B.R. 208, 218, 226-29 (Bankr. E.D.N.Y. 2010) (affirming appointment based on*, inter alia*, acrimony between debtor and certain creditors, notwithstanding the objection of one creditor, and noting that

46

such acrimony, "standing alone, has been found to be a basis" for appointment (citation omitted));

*Petit v. New Eng. Mortg. Servs., Inc*., 182 B.R. 64, 65-66, 68, 70 (D. Me. 1995) (citation omitted)

(appointing trustee based on debtor's "tangled history" and "deep-seeded conflict and animosity"

with one among several creditors resulting from debtor's "obstructionist and evasive" behavior in

discovery disputes with that creditor, while noting that some creditors actually opposed

appointment); *see also In re Marvel Entertainment Group*, 140 F.3d 463, 468, 474 (3d Cir. 1998)

(affirming appointment of trustee based on, inter alia, acrimony between debtor and "various

creditors," not including creditors who also controlled the debtor, without any mention of whether

such acrimony with all or even most creditors must exist for such finding).


### B. Skytec:

Logistic's motion (the "Motion") commences with the allegation that Debtor made

"unusual" disbursements to vendors and suppliers within 90 days from the petition date.  Logistics

proceeds to highlight the work "unusual" in order to muddy the waters and mislead the Court to

believe that the payments were not in the ordinary course of business.

First, it must be underscored that Logistics was one of Debtor's main vendors and as

previously disclosed in the motion to disqualify Logistics' vote (Docket No. 142), Debtor paid

Logistics more than **$6 Million** within a 4 year period; and more importantly, the payments were

made exactly in the same manner that Debtor paid all its vendors, i.e. as soon as possible after the

government pays its invoices.  However, in the Motion Logistics not only remains silent as to its

collection experience with Debtor, but includes the list of payments that Debtor submitted in its

statement of financial affairs alleging that these were not in the ordinary course of business and

are avoidable.

Again, Logistics conveniently fails to mention that this allegation as to alleged preferential transfers was first raised by Logistics in January 2019, and the undersigned attorney answered the same through an email dated February 7, 2019. In said email, the undersigned clearly stated Debtor's position regarding the alleged preferential transfers, which is that there are no preferential transfers in the subject case insofar as all payments made by Debtor within the 90 days before the bankruptcy filing and/or within one year before the bankruptcy filing were made while Debtor was solvent, were for debts that were not past-due, and/or were made in the ordinary course of business. Debtor does not refute the caselaw cited by Logistics in the Motion; however, the facts of the captioned case when applied to the cited caselaw does not even come close to warrant the appointment of a Chapter 11 Trustee.

Logistics commences its argument by rehashing the District Court order to try to prove that Debtor has engaged in gross misconduct. If must be underscored the fact that Logistics does not cite a single caselaw to prove this allegation. The reason for not citing a case is simple, there is no caselaw justifying the appointment of a Chapter 11 Trustee due to a pre-petition conduct in a lawsuit, particularly when the misconduct was solely related to discovery issues and as Debtor has already disclosed was due to Debtor's prior legal representation.

The next legally groundless argument listed in the Motion to justify the appointment of a Trustee is the alleged avoidance actions. Debtor restates its prior arguments to refute Logistics' argument as to the alleged avoidance actions. It suffices to say that Logistics fails to prove that any of the transfers meet the requirements of Section 547 of the Bankruptcy Code. As aforementioned Debtor was solvent at the time of the transfers; these were made according to contractual terms; or were made in the ordinary course of Debtor's business. More importantly, CPA Luis Carrasquillo has submitted a report proving Debtor's solvency. Debtor's solvency can

be ascertain by this Court not only by the report of CPA Carrasquillo but by applying the ability-to-pay test followed by bankruptcy courts. Moreover, in the event this Courts determines that Debtor was insolvent, CPA Carrasquillo's report lists several payments as potentially voidable and Debtor has agreed to prosecute said actions in said event.

Then Logistics proceeds to allege that somehow Debtor's Plan of Reorganization proves the alleged misconduct. However, Debtor's Plan of Reorganization complies with all the provisions of the Bankruptcy Code regardless of the unfounded allegations made by Logistics. Logistics' allegation that the Plan "improperly classified administrative claimants being paid in full" is perplexing and devoid of any evidence whatsoever.

In its continued effort to muddy the waters Logistics alleges that the payments made by Debtor before the bankruptcy filing were "orchestrated on the eve of bankruptcy". However, Logistics fails to disclose that during the extensive discovery that Debtor voluntarily agreed to provide them, they receive evidence that all payments were made as soon as Debtor's clients made the subject payments and according to contractual terms.

The alleged "use of corporate assets for the personal benefit of insiders" is solely based on the compensation packages of the insiders. How does that equates to "deterioration of debtor's assets" or "gross mismanagement" is mind blowing. Furthermore, all transfers were listed in the schedules and statement of financial affairs, regardless of the fact that said entities were no longer creditors of the Debtor; Debtor endured two 341 Meetings of Creditors wherein Logistics interrogated Debtor's officers; Debtor submitted to Logistics a plethora of documents requested by them after the 341 Meetings of Creditors regarding all of Debtor's business affairs before the bankruptcy filing including without limitation all the payments that could be subject to avoidance actions; and Debtor voluntarily submitted itself to Rule 2004 Examinations by Logistics.

Debtor's management has faithfully carried out its fiduciary duties throughout the pendency of the captioned bankruptcy case.  As aforementioned, it had fully disclosed all the information that has been requested from them even if it is beyond the requirements of the Bankruptcy Code.  It has filed a plan of reorganization that pays more than the liquidation value of the corporation for the benefit of its creditors, including a dividend of $567,072 to its unsecured creditors.  Logistics wants more.  But the liquidation value of the corporation and the cash flow generated by the operations actually yields less than the amount being paid.  The contribution from Debtor's shareholders provides the feasibility needed in order to pay to the unsecured creditors the aforementioned dividend.  If Debtor's management had opted to not carry its fiduciary duties no contribution would be made in order to comply with the provisions of the Bankruptcy Code.

Logistics tries to justify the appointment of a Chapter 11 Trustee on the acrimony that exists between Debtor and Logistics.  But the caselaw cited by Logistics is inapposite to its request.  In the captioned case the only creditor that had and/or has an animosity with Debtor is Logistics.  And it appears that Logistics is trying to not only continue with the animosity but escalate it by its unwarranted litigation.

Lastly, Logistics is now trying to include arguments that were never included nor hinted in the Motion.  Debtor's contention is that said arguments should not be considered by the Court since there were never included in the related pleadings.

## IV.    EXHIBITS LIST

The parties have exchanged copies of their exhibits.

### A.  LogiSYS:

| | Documents | | |
|---|---|---|---|
| 1. | Opinion and Order, Sep. 12, 2018, *Skytec, Inc. v.* | | |

| | | | |
|---|---|---|---|
| | *Logistic Systems, Inc.*, Civil No. 15-2104 (BJM) *see* Civil Dkt. # 160 | | |
| 2. | Opinion and Order, March 15, 2019 Civil Dkt. #184 | | |
| 3. | Judgment, March 15, 2019, Civil Dkt. #186 | | |
| 4. | Amended order, May 23,2019, Civil Dkt. #188 | | |
| 5. | Amended Final Judgment, May 23, 2019, Civil Dkt. #189 | | |
| 6. | Order of May 4, 2017 granting in part Motion to Compel or to Strike Experts filed by LogiSYS in the Civil Case, in which it disallowed Skytec's experts in the case. *See* Civil Dkt. # 59. | | |
| 7. | Skytec's "Response in Opposition to Defendant's Motions Entered at Dkt. # 70 and Dkt. # 71," July 31, 2017, Civil Dkt. # 75 | | |
| 8. | Debtor's Schedules and Statement of Financial Affairs dated October 4, 2018, Dkt. # 29, and amended schedules | | |
| 9. | Debtor's Amended Petition and Schedules E/F, Dkt. ## 214-1_and 212-2 | | |
| 10. | Invoices paid to MVS Leading Satellite within 90 days prior to filing as produced by Debtor | | |
| 11. | Invoices paid to TxRX Systems Satellite within 90 days prior to filing as produced by Debtor | | |
| 12. | Invoices paid to EF Johnson Satellite within 90 days prior to filing as produced by Debtor | | |
| 13. | Invoices paid to Daniels Electronics Satellite within 90 days prior to filing as produced by Debtor | | |
| 14. | List of Items Acquired within 20 days of the petition date. (Item 6 produced by Debtor after 341 meeting of creditors) Supplement to Official form 206A/B, Part 5, Question 25. | | |
| 15. | Refunds for advance payments to Annie Astor within one year prior to filing as produced by Debtor | | |
| 16. | Payments to Carbonell & Co. within 90 days prior to filing as produced by Debtor | | |
| 17. | Revised Statement of Debtor's Prepetition payments | | |
| 18. | Dkt # 63 - Skytec, Inc. Monthly Operating Report September 2018- Pages 1- 13 FirstBank bank account Statements before and after filing of the petition, at pp. 68-70 | | |
| 19. | Dkt # 66 Skytec, Inc. Monthly Operating Report October 2018 | | |
| 20. | Dkt # 75 Skytec, Inc. Monthly Operating Report November 2018 | | |
| 21. | Dkt # 107 Skytec, Inc. Monthly Operating Report | | |

| | | | |
|---|---|---|---|
| | December 2018 | | |
| 22. | Dkt # 113 Skytec, Inc. Monthly Operating Report January 2019 | | |
| 23. | Dkt # 134 Skytec, Inc. Monthly Operating Report February 2019, | | |
| 24. | Dkt # 177 Skytec, Inc. Monthly Operating Report March 2019, | | |
| 25 | Dkt # 206 Skytec, Inc. Monthly Operating Report April 2019 | | |
| 26 | Dkt # 219 Skytec, Inc. Monthly Operating Report May 2019 | | |
| 27. | Dkt. #  228 Skytec, Inc. Monthly Operating Report June 2019 | | |
| 28. | Dkt. # , Skytec, Inc. Monthly Operating Report July 2019- reserved to be used if filed before the hearing and if necessary. | | |
| 29. | Transcript of Rule 2004 Examination of Ms. Annie Astor | | |
| 30 | Transcript of Rule 2004 Examination of Mr. Henry Barreda | | |
| 31 | Income Tax Return produced by Skytec for 2014 | | |
| 32 | Income Tax Return produced by Skytec for 2015 | | |
| 33 | Income Tax Return produced by Skytec for 2016 | | |
| 34 | Income Tax Return produced by Skytec for 2017 | | |
| 35 | **480.6B Annie Astor** for the year 2017, reflecting payment of interest under section 1023.05(b) in the amount of $1, 055.57 | | |
| 36 | **480.6B Annie Astor** for the year 2018, reflecting payment of interest under section 1023.05(b) in the amount of $88.33 | | |
| 37 | **480.6A M&A CPA Advisor** for the year 2018, reflecting payment of interest under section 1023.05(b) in the amount of $35,000 | | |
| 38 | **480.6B M&A CPA Advisor, Inc**. for the year 2017 reflecting payments for services rendered in the amount of $156,000. | | |
| 39 | **480.6B M&A CPA Advisor, Inc**.,for the year 2018 reflecting payments for services rendered in the amount of $157,534.45 | | |
| 40 | PR Form 499R-W2PR Nadja Gonzalez Conde for 2018 | | |
| 41 | PR Form 480.6B Nadja Gonzalez Conde for the year 2017 | | |
| 42 | PR Form 499R-W2PR Nadja Gonzalez Conde for 2018 | | |
| 43. | **Form 499R-W2PR Henry Barreda** for 2017 | | |

| | | | |
|---|---|---|---|
| | reflecting only salaries, in the amount of $85,485.81 | | |
| 44 | **Form 499R-W2PR Henry Barreda** for 2018 reflecting only salaries in the amount of $90,485.73 | | |
| 45 | Oriental Bank's Term Loan Agreement | | |
| 46 | Mortgage Note over Property located at Bo. Guaraguao, Bayamon, PR | | |
| 47 | Copy of unsigned purchased deed of Property located at Bo. Guaraguao, Bayamon, PR | | |
| 48 | Copy of Certificate from the Puerto Rico Property Registrar regarding property located at Bo. Guaraguao, Bayamon, PR. | | |
| 49 | National Bureau of Labor Statistics Occupational Employment & Wages Statistics – Puerto Rico 2018 | | |
| 50. | Skytec's Disclosure of Affiliated Entities produced by Skytec as Item 3 to production of documents after the first session of the Section 341 Meeting of Creditors | | |
| 51 | Skytec's Financial Statements' Analysis (2012-2017) | | |
| 52 | Skytec, Inc. Financial Statements for the year ended December 31, 2014 | | |
| 53 | Skytec, Inc. Financial Statements for the year ended December 31, 2015 | | |
| 54. | Skytec, Inc. Financial Statements for the year ended December 31, 2016 | | |
| 55. | Skytec, Inc. Financial Statements for the year ended December 31, 2017 | | |
| 56. | Skytec, Inc. Bank account statement corresponding to June, 2018 | | |
| 57. | Skytec, Inc. Bank account statement corresponding to July, 2018 | | |
| 58. | Skytec, Inc. Bank account statement corresponding to August, 2018 | | |
| 59. | Skytec, Inc. Bank account statement corresponding to September, 2018 | | |
| 60. | Debtor's Liquidation Analysis Dkt. 91-5 | | |
| 61. | Debtor's Liquidation Analysis (for amended disclosure statement) Dkt. 175-6 | | |
| 62. | American Express Miguel Carbonell- Skytrackers, Inc. credit cards account statements | | |
| 63. | American Express Annie Astor credit card account statements | | |
| 64. | Banco Popular Visa Signature #6598- Annie Astor credit card account statements | | |
| 65. | BPPR MC #5511 Annie Astor credit card account statements | | |
| 66. | BPPR MC#5054 Annie Astor credit card account | | |

| | statements | | |
|------|-------------------------------------------------------------------------------------------------------------------------------------------------|---|---|
| 67. | First Bank MC # 2993 Annie Astor credit card account statements | | |
| 68. | First Bank MC # 6206 Annie Astor credit card account | | |
| 69. | Oriental Bank Henry Barreda credit card account statements | | |
| 70. | Expert Report by Mr. Carlos Baralt, CPA., July 23, 2019 | | |
| 71. | Complaint in SEC v. Angel Alvarez Perez and Annie Astor Carbonell, Civil No. 08-8009 (DAB) (SDNY), September 16, 2008 | | |
| 72. | Final Judgment as to Defendant Annie Astor Carbonell, in SEC v. Angel Alvarez Perez and Annie Astor Carbonell, Civil No. 08-8009 (DAB) (SDNY), October 17, 2008 | | |
| 73. | In the matter of Annie Astor Carbonell (CPA) - SEC Order Instituting Administrative Proceedings Pursuant to Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions, November 24, 2008 | | |
| 74. | Transcript of Hearing on Final Approval of Disclosure Statement and Confirmation Hearing of Ch. 11 Plan and Objection to Disclosure Statement, and on Motion for Appointment of Chapter 11 Trustee, 05/17/2019 | | |

**B. Skytec:**

A.    Debtor's Statement of Financial Affairs

B.    Debtor's Amended Schedules

C.    Debtor's First Amended Disclosure Statement with all its Exhibits.

D.    Debtor's Plan of Reorganization.

E.    Report prepared by CPA Luis R. Carrasquillo & Co, PSC on possible avoidable

transfers

F.    Letter from the Puerto Rico Emergency Management Administration.

G.    Debtor's Audited Financial Statements for 2016

H.    Debtor's Audited Financial Statements for 2017

I.      Debtors's Unaudited Financial Statements for August 31, 2018

J.      Detail of Collections of Emergency Projects in 2018

K.      Detail of Collections for the Years Ended December 31, 2016, 2017, and 2018

L.      Copies of the Emergency Projects Purchase Orders

M.      Evidence of Collections from Emergency Projects

N.      Gantt Chart for CEM Project

O.      Gantt Chart for AEMEAD Project

P.      Letter from Mr. Carlos A. Rodriguez Vidal dated January 23, 2019

Q.      See E-mail from Mr. Alexis Fuentes dated February 8, 2019

R.      First CAD Contract (AEMEAD)

S.      Second CAD Contract (LEDS)

T.      Third CAD Contract (LE Metro I)

U.      Fourth CAD Contract (LE Metro II)

V.      Steven Hoover's e-mail to Hien Nguyen on 12/21/10.  Documents # 78480, 78481 and 78483 of Logistic Systems'pr oduction.

W.      Srinivas Mondava's e-mail to Carol Minjares on December 2, 2010. Document # 6293 of Logistic Systems' production.

X.      E-mails between Steve Hoover and Hien Nguyen of 6/6/2010 to 6/8/2010. Documents # 6042 to 6049 of Logistic Systems' production.

Y.      E-mails between Hien Nguyen, Charles Stortz, Steve Hoover and Srinivas Mondava dated 4/23/2010 and 4/30/2010. Documents #6547 to 6554 of Logistic Systems' document production.

Z.      E-mail from Srinivas Mondava to Dean Phillips and Robert Bowman, dated January 31, 2012. Document # 51,789 of Logistic Systems' production.

AA.     E-mails between Charles Stortz, Srinivas Mondava and Arika Steele. Documents # 9700,9701 and 9702 of Logistic Systems' production.

BB.    E-mail from Skytec's Victor Maldonado to Steve Hoover, dated November 7, 2010. Document # 14,931 of Logistic Systems' production.

CC     E-mail conversation between Srinivas Mondava and Joe Lawson, dated 10/10/2011. Document # 52053 of Logistic Systems' production.

DD.    E-mail conversation between Joe Lawson and Srinivas Mondava, dated 1/12/2012. Document # 34596 of Logistic Systems' production.

EE.    E-mail conversation between Srinivas Mondava and Joe Lawson, dated 3/16/2012. Document # 51210 of Logistic Systems' document production.

FF.    E-mail conversation between Srinivas Mondava and Steve Hoover, dated 10/04/2012. Document # 50541 of Logistic Systems' production.

GG.    E-mail conversation between Srinivas Mondava and Steve Hoover, dated 3/15/2013. Document # 50429 of Logistic Systems' production.

HH.    E-mail conversation between Srinivas Mondava and Joe Lawson, dated 3/19/2013. Document # 50397 of Logistic Systems' production.

II.     E-mail conversation between Srinivas Mondava and Robert Bowman, dated 4/15/2013. Document # 50360 of Logistic Systems' production.

JJ.     E-mail conversation between Charles Stortz and Daniel Boardman, dated 6/14/2013. Document # 9470 of Logistic Systems' production.

KK.    E-mail conversation between Charles Stortz, Srinivas Mondava and Hien Nguyen, dated 8/9/2013. Document # 9518 of Logistic Systems' production.

LL.    E-mail conversations between Charlie Storz, Arika Steele, Louis Jensen and Udloc Nguyen dated: 12/20.2013, 8/6/2013 and 10/19/2013.  Documents 62,543 to 62546 of Logistic Systems' production.

MM.   E-mails between Srinivas Mondava, Charles Stortz and Lois Jensen. Documents # 62749, 62750 and 62751 of Logistic Systems' production.

NN.    Transcript of Mr. Joseph Lawson´s deposition taken on December 7, 2016.

OO.    Amended 480.6 Form of M A CPA Advisor for the tax year 2018.

PP.    E-mails between Srinivas Mondava and Hien Nguyen dated 4/5/2014 and 4/4/2014. Documents # 78006 and 78007of Logistic Systems' production.

QQ.    E-mails between Victor Maldonado, Michael Waite, Daniel Boardman, and Srinivas Mondava dated 10/30/2014 and 10/29/2014.   Document # 77229 of Logistic Systems' production.

RR.    Statement of Work for PRLEDS.  Document #11088 to 11100 of Logistic Systems' production.

SS.    Statement of Work for AEMEAD.   Document #26591 to 26592 of Logistic Systems' production.

TT.    Email between Annie Astor and Charles Stortz dated 9/7/2010.  Document #5153 of Logistic Systems' production.

UU.    Email between Victor Maldonado and Steve Hoover and Daniel Boardman dated 10/15/2010.  Document #5017 to 5019 of Logistic Systems' production.

VV.    Email between Victor Maldonado and Daniel Boardman dated 11/10/2010. Document #5960 of Logistic Systems' production.

WW.    Email between Victor Maldonado and Robert Bowman dated 10/26/2011. Document #52008 to 52009 of Logistic Systems' production.

XX.    Email between Victor Maldonado and Joe Lawson and Ivan Caballero dated 4/23/2012.  Document #8867 to 8870 of Logistic Systems' production.

YY.    Email between Abiezer Reyez, Daniel Boardman and Victor Maldonado dated 4/27/2012.  Document #18850 of Logistic Systems' production.

ZZ.    Email between Victor Maldonado and Joe Lawson dated 5/2/2012.  Document #8873 to 8874 of Logistic Systems' production.

AAA. Email between Victor Maldonado and Steve Hoover and Joe Lawson dated 5/21/2012.    Document #8761 to 8762 of Logistic Systems' production.

BBB.   Email between Abiezer Reyes, Jason More, Daniel Boardman, Steve Hoover and Victor Maldonado dated 4/13/2013.   Document #19240 to 19241 of Logistic Systems' production.

CCC.   Email between Victor Maldonado and Charlie Stortz and Joe Lawson dated 4/18/2013.      Document #41201 of Logistic Systems' production.

DDD.   Email between Victor Maldonado and Charlie Stortz and Joe Lawson dated 6/12/2013.      Document #9494 of Logistic Systems' production.

EEE.   Emails between Victor Maldonado and Logistics personnel dated June 16 through 18, 2013.  Document #9587 to 9596 of Logistic Systems' production.

FFF.   Emails between Abiezer Reyes, Jose Lawson, Charlie Stortz, Steve Hoover and Victor Maldonado dated 3/13/2013.   Document #9286 to 9290 of Logistic Systems' production.

GGG.   Emails between Victor Maldonado and Logistics personnel dated April 17, 2014.      Document #10250 to 10252 of Logistic Systems' production.

HHH.   Emails between Victor Maldonado and Logistics personnel dated June 5, 2014.      Document #10299 to 10301 of Logistic Systems' production.

III.   Emails between Abiezer Reyes, Michael Waite, Daniel Boardman, and Victor Maldonado dated 6/17/2014.   Document #75531 to 75533 of Logistic Systems' production.

JJJ.   Email between Victor Maldonado and Michael Waite dated 5/12/2014.  Document #33931 of Logistic Systems' production.

KKK.   Email between Victor Maldonado and Michael Waite dated 10/30/2014. Document #10333 to 10335 of Logistic Systems' production.

LLL.   Email between Victor Maldonado and Joe Lawson and Charlie Stortz dated 8/9/2013.  Document #40271 to 40273 of Logistic Systems' production.

MMM. Any and/or all of Logistics' exhibits.

## V.    WITNESSES LIST

### A.  LogiSYS:

1.      Annie Astor, Debtor's acting CFO (Ms. Astor acts as CFO of Debtor, is married to one of Debtor's shareholders, and will continue to testify about Debtor's financial, accounting, and banking operations, including matters rekated to the acts of the board of directors, officers, and other insiders, as well as on the ground for potential avoidance actions)

2.      Henry Barreda, Debtor's President  (Mr. Barreda is the Debtor's President, one of its two shareholders, and will testify about Debtor's financial, operations, including matters related to the acts of the board of directors, officers, and other insiders, as well as on the grounds for potential avoidance actions)

3.       Samuel Bull (Mr. Bull was one of LogiSYS's counsel of record in the U.S. District Court litigation and may testify about the state of that case and notice through pleadings)

### B.  Skytec:

1.      Ms. Annie Astor (Debtor's CFO) – Ms. Astor shall testify about Debtor's actions pre and post the bankruptcy petition; the nature of Debtor's business; the manner in which Debtor pays its employees, suppliers and creditors; Debtor's special projects and the financing needed for these projects; Debtor's ability to pay its creditors; Debtor's assets and liabilities; Debtor's relationship with LogiSYS and its disputed claim; Debtor's plan of reorganization; and the possibility of filing avoidance actions.

2.      Mr. Henry Barreda (Debtor's President) – Mr. Barreda shall testify about Debtor's actions pre and post the bankruptcy petition; the nature of Debtor's business; the manner in which Debtor pays its suppliers and creditors; Debtor's special projects; Debtor's ability to pay its creditors; Debtor's assets and liabilities; Debtor's relationship with LogiSYS and its disputed claim; Debtor's plan of reorganization; and the possibility of filing avoidance actions.

3.      Victor Maldonado (Debtor's Chief Technology Officer and project manager) – Mr. Maldonado shall testify about his responsibilities as Debtor's CTO; the special projects

where Debtor subcontracted LogiSYS; the problems with said projects; and LogiSYS' non-compliance with its obligations thereunder.

## VI.    EXPERT WITNESSES

### A. LogiSYS:

Mr. Carlos Baralt –Mr. Baralt shall testify about his analysis of Mr. Luis Carrasquillo's work in this case and about the following opinions:

1.    Debtor was insolvent as of December 31, 2016 and 2017, and as of August 31, 2018.

2.    Pre-petition payments totaling approximately $638,000 were cleared by the bank for payment post-petition.

3.    The available information, including Debtor's Financial Consultant's Report, is insufficient to validate whether all payments not identified as avoidable, were made in due course of business, for contemporaneous exchange of value, or in accordance with negotiated terms.

4.    Upon the additional information provided by Skytec's expert, Mr. Luis Carrasquillo, Mr. Baralt has continued his analysis and may provide a supplemental report, if necessary, within the next (7) seven days.

### B. Skytec:

Mr. Luis Carrasquillo, CPA – Mr. Carrasquillo shall testify about his report, including without limitation, his analysis of Debtor's solvency, his analysis of all payments made by Debtor within the avoidance period, and his conclusions thereabout.

## VII.    ESTIMATED TIME NEEDED

The parties estimate that each will require between eight (8) and sixteen (16) hours for the presentation of their case.

Respectfully Submitted,

In San Juan, Puerto Rico, this 2nd day of August, 2019.

s/Alexis Fuentes-Hernández, Esq.
**Alexis Fuentes-Hernández, Esq.**
USDC-PR 217201
**FUENTES LAW OFFICES, LLC**
P.O. Box 9022726
San Juan, PR 00902-2726
Tel. (787) 722-5215, 5216
E-Mail: alex@fuentes-law.com


*s/ Carlos A. Rodriguez-Vidal*
Carlos A. Rodríguez-Vidal
USDC PR 201213

*s/ Solymar Castillo Morales*
Solymar Castillo Morales
USDC PR 218310
Counsel for Creditor LogiSYS Systems, Inc.
GOLDMAN ANTONETTI & CORDOVA, LLC
Post Office Box 70364
San Juan, PR 00936-8364
Telephone #: (787) 759-4117
Facsimile #: (787) 767-9177
Email: crodriguez-vidal@gaclaw.com
        scastillo@gaclaw.com


*/s/ Andrew Morton*
Andrew Morton
Washington State Bar No. 49467
*Pro Hac Vice* Counsel for creditor Logistic Systems, Inc.

*s/ Bryan T. Glover*
Bryan T. Glover
Washington State Bar # 51045
*Pro Hac Vice* Counsel for Creditor LogiSYS Systems, Inc.