## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

IN RE:

**SKYTEC, INC.**

      **Debtor**

**CASE NO.  18-05288 (ESL)**

**CHAPTER 11**

## SECOND AMENDED DISCLOSURE STATEMENT

## OF

## SKYTEC, INC.

*s/Alexis Fuentes-Hernández, Esq.*
**Alexis Fuentes-Hernández, Esq.**
USDC-PR 217201
**FUENTES LAW OFFICES, LLC**
P.O. Box 9022726
San Juan, PR 00902-2726
Tel. (787) 722-5215, 5216
E-Mail: alex@fuentes-law.com

Skytec, Inc.                                         **Case No. 18-05288 (ESL)**
*Second Amended Disclosure Statement*                                        Page 2

# INDEX

I.   **INTRODUCTION** ....................................................................................................... 4

II.   **SUMMARY OF THE PLAN** ...................................................................................... 5

    *3.1 Purpose of a Disclosure Statement* ............................................................. 9
    *3.2 Voting Procedure* ........................................................................................ 9
    *3.3 Ballots* ...................................................................................................... 10
    *3.4 The Confirmation Hearing* ....................................................................... 10
    *3.5 Acceptances Necessary to Confirm the Plan* ............................................ 11
    *3.6 Confirmation of the Plan Without the Necessary Acceptances* ................. 12

IV.     **GENERAL INFORMATION** ................................................................................. 12

    *4.1 Description and Historical View of the Debtor.* ........................................ 12

V.   **CLAIMS AGAINST DEBTOR AND ITS ASSETS** .............................................. 19

    *5.1 Claims Against Debtor* .............................................................................. 19
    *5.2 Objections to Claims* ................................................................................ 19

VI.   **DESCRIPTION OF THE PLAN** ............................................................................. 20

    *6.1 Unclassified Claims* .................................................................................. 21
    *6.2 Administrative Expense Claims* ................................................................ 21
    *6.3 Professional Fee Claims* ........................................................................... 21
    *6.4 Priority Tax Claims and Other Priority Claims* ....................................... 22
    *6.12 Executory Contracts and Unexpired Leases* ........................................... 28
    *6.13 Exculpation* ............................................................................................. 28

VII.     **LIQUIDATION AND FINANCIAL ANALYSIS** .................................................. 29

    *7.1 Best Interest of Creditors and Comparison with Chapter 7 Liquidation* ...... 30
    *7.2 Feasibility of the Plan* ............................................................................... 30
        A)   Financial Projections ....................................................................... 30
          a) Real Property ............................................................................ 30
          d) Liquidation Analysis ................................................................. 34
    *7.3 Pending Litigation and Other Liabilities* .................................................. 34

VIII.   **BAR DATE AND DETERMINATION OF CLAIMS** ........................................... 35

    *8.1 Bar Date* .................................................................................................... 35
    *8.2 Determination of Claims* .......................................................................... 35

IX.   **ALTERNATIVES TO THE PLAN** ....................................................................... 36

        A.   Liquidation Under Chapter 7 ............................................................. 36
        B.   Dismissal of the Case ......................................................................... 37
        C.   Alternative Plan of Reorganization .................................................... 37

XI.   **CONCLUSION** ...................................................................................................... 37

**Skytec, Inc.**                                                                   **Case No. 18-05288 (ESL)**
*Second Amended Disclosure Statement*                                               Page 3

## LIST OF EXHIBITS

Exhibit A- Ballots
Exhibit B- Order Approving Disclosure Statement
Exhibit C- Summary of Claims and Plan Payments
Exhibit D- Priority Tax Claims
Exhibit E- Liquidation Analysis
Exhibit F – Cash Flows Projections
Exhibit G- Monthly Operating Report as of August 31, 2019
Exhibit H –Audited Financial Statements December 31, 2018
Exhibit I –Interim Financial Statements August 31, 2019

## I.   INTRODUCTION

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §101, *et seq.* (the "Bankruptcy Code"), Skytec, Inc., debtor and debtor-in-possession in the above captioned case ("Debtor"), provides this Second Amended Disclosure Statement (the "Disclosure Statement") to all of its known creditors.  The purpose of the Disclosure Statement is to provide such information as Debtor believes may be deemed necessary for its creditors to make an informed decision in exercising their rights to vote on Debtor's Second Amended Plan of Reorganization (the "Plan"), dated as of the date of the Disclosure Statement.  The Plan is being filed with the United States Bankruptcy Court for the District of Puerto Rico ("Bankruptcy Court") simultaneously herewith.

Debtor recommends that you vote to accept the Plan.  Each creditor must, however, review the Plan and the Disclosure Statement carefully, including all exhibits in their entirety, and determine whether or not to accept or reject the Plan based upon each creditor's independent judgment and evaluation.  The description of the Plan in the Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before deciding to accept or reject the Plan.  Capitalized terms not otherwise defined herein have the same meaning as set forth in the Plan, other terms shall have the meaning ascribed to them in the Bankruptcy Code.

The information contained in the Disclosure Statement has been provided by Debtor's management based upon Debtor's knowledge of its records, business, and affairs. Except as otherwise expressly indicated, the information provided by Debtor in the Disclosure Statement has not been subject to an audit or independent review. Although great efforts have been made to be accurate, Debtor, its counsel and other professional advisors do not warrant the accuracy of the information contained herein.

The Disclosure Statement has not yet been approved by the Bankruptcy Court as providing information deemed adequate to permit Debtor's creditors to make an informed judgment in exercising their right to vote for or against the Plan.

No representations concerning Debtor, including the value of its assets, or the aggregate dollar amount of claims which may be allowed are authorized other than as set forth in the Disclosure Statement. Any representations, warranties or agreements made to secure acceptance or rejection of the Plan by Debtor's creditors that differ from those contained in the Disclosure Statement should not be relied upon in voting on the Plan.

Debtor believes that the Plan provides the quickest recovery and will maximize the return to creditors on their Claims. **ACCORDINGLY, DEBTOR URGES ALL CREDITORS TO VOTE IN FAVOR OF ITS PLAN.**

## II.   SUMMARY OF THE PLAN

The Plan specifies the manner in which the Claims and Interests are to be treated.  Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not classified for purposes of voting under the Plan, but the Plan does provide for the treatment of such Claims.  The table below provides a summary of the treatment of those claims and of the various Classes of Claims against Debtor, as well as of Debtor's shareholders interest in Debtor.  To the extent that the terms of the Disclosure Statement vary from those of the Plan, the terms of the Plan will control.

Skytec, Inc.                                                                 Case No. 18-05288 (ESL)
*Second Amended Disclosure Statement*                                                    Page 6

| Description of Claims | Class | Estimated Amount of Allowed Claim | Treatment and Estimated Recovery Under the Plan |
|---|---|---|---|
| Holders of Allowed Administrative Expense Claims | N/A | $204,406.00 | Unimpaired<br><br>Estimated Recovery: 100%<br><br>Except as otherwise agreed to by Debtor and the Holder of an Allowed Administrative Expense Claim, each such holder shall be paid in full in cash in the ordinary course of business.<br><br>Payments to Professionals will be made as approved by the Bankruptcy Court during the pendency of the Chapter 11 Case. US Trustee's Quarterly fees will be paid when due, with any pending balance to be paid on or before the Effective Date of the Plan (the "Effective Date"). |
| Holders of Allowed Priority Tax Claims (Secured and Unsecured) | N/A | $25.00 | Unimpaired.<br><br>Estimated Recovery: 100%<br><br>Holders of Allowed Priority Tax Claims (Secured and Unsecured), if any, will be 100% of their allowed claims, in cash, on the Effective Date. |
| The Secured Claims of Oriental Bank Puerto Rico ("Oriental") | Class 1 | $2,026,902.06 | Impaired<br><br>Estimated Recovery: 100%<br><br>Oriental's claims, secured by UCC filings over Debtor's cash accounts, trade accounts receivable, inventories, intangibles, and substantially all of Debtor's personal property, shall be paid in seventy-two (72) equal consecutive monthly payments of $12,786.49, with any arrears to be paid together with a balloon payment of any unpaid principal balance, due on December 31, 2025. Oriental will retain its lien encumbering its collateral until the full |

**Skytec, Inc.**                                                          Case No. 18-05288 (ESL)
*Second Amended Disclosure Statement*                                                          Page 7

| | | | payment of its allowed claim. |
|---|---|---|---|
| Holders of Pre-Petition Cure Claims against Debtor, arising from the assumption by Debtor of Unexpired Executory Contracts | Class 2 | $93,661.96 | Impaired<br><br>Estimated Recovery: 100%<br><br>The Allowed Pre-Petition Cure Claims arising from assumed executory contracts, will be paid as follows:<br><br>a) The claim of FirstBank consisting of a lease agreement secured by a Ford F-250SD 4x4, 2018, Plate #991-208, VIN number 1FT7W2BT5JEB79043, will continue to be paid in accordance with the contractual terms for the lease, with monthly payments of $1,003.00. Any arrears under this claim will be paid at the end of the lease.<br><br>b) The claim of FirstBank consisting of a lease agreement secured by an Acura MDX 2014, Plate #IFT-332, VIN number 5FRYD4H60EB009781, will continue to be paid in accordance with the contractual terms for the lease, with monthly payments of $1,164.00. Any arrears under this claim will be paid at the end of the lease.<br><br>c) McGRATH RENT CORP (dba TRS-REN TELCO) lease for various equipment will be paid in six (6) equal consecutive monthly payments of $1,011.54, commencing on the Effective Date. |
| Holders of Allowed General Unsecured Claims | Class 3 | $4,354,832.00 | Impaired<br><br>Estimated Recovery: 20%<br><br>The Holders of Allowed General Unsecured Claims shall be paid in full satisfaction of their claims, a pro-rata dividend in the total amount of |

| | | | $870,966.42 to be paid as follows: |
|---|---|---|---|
| | | | (i)  $200,000 on the Effective Date to be paid from the capital contribution of the shareholders and; |
| | | | (ii)  $670,966.42 in 36 monthly payments commencing on the Effective Date. |
| | | | The aforementioned $870,966.42 constitutes a 20% dividend of the claims expected to be allowed as detailed in **Exhibit C** of the DS. |
| | | | As detailed below, said dividend could be increased by the Plan Administrator depending on Debtor's actual cash flows during the subject period of time. |
| | | | In the event that the allowed claims under this class increase, the first installment to be paid as of the Effective Date as well as the monthly payments, will be adjusted and paid on a pro-rata basis to the Holders of Allowed Claims under this Class. |
| The Equity Interests | Class 4 | N/A | Unimpaired. Estimated Recovery:  N/A The Equity Holder will not receive any distribution under the Plan, but will retain his shares in Debtor, unaltered. |

For a more detailed description of the treatment of the foregoing classes of Claims and Interest see "Treatment of Claims and Interest Under the Plan".

The Disclosure Statement has been prepared by Debtor to provide creditors with adequate information so that they can make an informed judgment about the Plan.  Each creditor should read the Disclosure Statement and the Plan in their entirety before voting on the Plan.  No solicitation of votes on the Plan may be made except pursuant to the Disclosure Statement and no person has been

authorized to utilize any information concerning Debtor's assets other than the information contained herein for purposes of solicitation.

## III.    INFORMATION ABOUT THE REORGANIZATION PROCESS

### 3.1    Purpose of a Disclosure Statement

This Disclosure Statement includes background information about Debtor and identifies the classes into which creditors have been placed in the Plan.  The Disclosure Statement describes the proposed treatment of each of those classes if the Plan is confirmed.  It also contains information concerning the prospects in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon its approval by the Bankruptcy Court, the Disclosure Statement, and the Exhibits thereto, will have been found to contain, in accordance with the provisions of the Bankruptcy Code, adequate information of a kind and in sufficient detail to enable a reasonable, hypothetical investor, typical of a holder of an impaired claim or an interest to make an informed judgment about the Plan. Approval of the Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

### 3.2    Voting Procedure

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot Forms accompanying this Disclosure Statement as **Exhibits A** to be returned to the following address:

**Skytec, Inc.**
**c/o Fuentes Law Offices, LLC**
**PO Box 9022726**
**San Juan, PR  00902**

The Ballots must be received **on or before 4:00 P.M. (Eastern Standard Time) on**

**_____, 2019,** to be counted in the voting. Ballots received after this time will not be counted in

the voting unless the Bankruptcy Court so orders.

Debtor recommends a vote for "ACCEPTANCE" of the Plan.

**3.3     Ballots**

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or equity interests

which are "impaired" under the terms and provisions of a plan are entitled to vote to accept or reject

such plan, except as provided in Section 1126(g) of the Bankruptcy Code as to any Class which is

deemed not to have accepted the Plan because the Plan provides that the claims or interests of such

class do not entitle the holders of such claims or interests to receive or retain any property under the

Plan on account of such claims or interests.

Members of Classes 1,2, and 3 are impaired under the Plan and entitled to vote.  They will be

asked to vote for acceptance or rejection of the Plan.  (See **Exhibits A**)

**3.4     The Confirmation Hearing**

Pursuant to Section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a

hearing on confirmation of the Plan to commence on _____, **2019** at ___.M., or as soon

thereafter as the parties can be heard.  The Confirmation Hearing will be held before the Honorable

Edward A. Godoy, United States Bankruptcy Judge, 300 Recinto Sur Street, San Juan, Puerto Rico

00901, or at such other place as may be indicated in the future, or before any other Bankruptcy Judge

that may be designated to hold the same at such place as may be indicated in the future. At the

Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various

requirements of the Bankruptcy Code, including whether it is feasible and in the best interests of

holders of claims and interests.  The Bankruptcy Court will also receive and consider a Report of

Plan Voting prepared by Debtor, summarizing the votes for acceptance or rejection of the Plan by parties entitled to vote.

The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

At the Confirmation Hearing with respect to the Plan, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for each Class, (ii) hear and determine objections, if any, to the Plan and to the confirmation of the Plan, that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be in writing, filed and served as required by the Bankruptcy Court pursuant to the order approving the Disclosure Statement, a copy of which is attached as **Exhibit B** hereto.

**3.5      Acceptances Necessary to Confirm the Plan**

The vote of each holder of an impaired claim is important since at the Confirmation Hearing and as condition to the confirmation of the Plan on a consensual basis, the Bankruptcy Court must determine, among other things, whether each impaired Class has accepted the Plan.  Under Section 1126 of the Bankruptcy Code, an impaired Class is deemed to have accepted the Plan if at least 2/3 in amount and more than 1/2 in number of the Allowed Claims of the Class members who actually cast ballots to accept or reject the Plan, accept the Plan.    Further, unless there is acceptance of the Plan by all members of an impaired Class, the Bankruptcy Court must also determine that under the Plan, Class members will receive property of a value, as of the Effective Date, that is not less than

the amount that such Class members would receive or retain if Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

**3.6     Confirmation of the Plan Without the Necessary Acceptances**

If a Class or Classes of impaired Claims do not accept the Plan, Debtor will request confirmation of the Plan under the "cram down" provisions of Section 1129(b) of the Bankruptcy Code, which permit confirmation, notwithstanding non-acceptance by one or more impaired classes, if the Bankruptcy Court finds that the Plan does not discriminate unfairly against and is fair and equitable as to each non-accepting Class, as long as at least one class of impaired creditors votes to accept the Plan.   Section 1129(b) of the Bankruptcy Code requires among other things, that claimants must either receive the full value of their claims and if they receive less, that no Class with junior liquidation priority may receive anything.

**THESE CALCULATIONS ARE BASED ONLY ON THE CLAIMS AMOUNTS AND NUMBER OF CREDITORS WHO ACTUALLY VOTE.   ANY BALLOT THAT IS VALIDLY EXECUTED THAT DOES NOT CLEARLY INDICATE REJECTION OF THE PLAN, SHALL BE DEEMED TO CONSTITUTE A VOTE FOR ACCEPTANCE OF THE PLAN.  THE VOTE OF EACH CREDITOR IS IMPORTANT.**

## IV.      GENERAL INFORMATION

**4.1     Description and Historical View of the Debtor.**

Debtor was incorporated under the laws of Commonwealth of Puerto Rico on January 19, 1999. Debtor is primarily engaged in the business of sales and installation of communications, emergency, and security systems, and software development and integration.

Since 1999 Debtor has been offering the most technologically advanced tools to guarantee cost-effective operations and ensure quick and efficient response to emergencies by consolidating

the control of all communications assets, including all essential dispatch assets. Debtor has over forty (40) dedicated employees and contractors, many of them with many years of experience in the communications field, including engineers and certified radio and electronics technicians, who work together in the design, development, and integration of specialized wireless communications systems.

Debtor serves the private sector as well as the public and government, including Public Safety and first response agencies. Debtor has become one of the foremost suppliers of federally funded communications and AVL products to the Puerto Rico State Government and its municipalities. Debtor provides all the systems and radio consoles needed to comply with requirements of the US Homeland Security Department for interoperability, so that all government dependencies which deal with security, law enforcement, and terrorist emergency situations are able to communicate effectively. Its modern facilities at Royal Industrial Park in Cataño include a state-of-the-art training center, which has served more than 2,000 emergency officers of all municipalities, since 2012.

Most recently, and with the advent of María Hurricane, they become an important provider in Puerto Rico of Satellite phones, to both public agencies and private companies.

Government clients represent about 80% of Debtor's business and most projects are funded with Homeland Security (Federal) funds. Debtor's principal clients are: Agencia Estatal para el Manejo de Emergencias, Emergencias Médicas, Autoridad de Energía Eléctrica, Autoridad de Carreteras, Caguas Expressway Motors, Suzuki del Caribe, Guardia Nacional de P.R., Administración de Servicios Médicos 911, Municipio de San Juan, Municipio de Carolina, Municipio de Ponce, Municipio de Bayamón, Banco Popular, First Bank and several manufacturing companies in Puerto Rico.

Notwithstanding all the above, Debtor's revenues have been in a decline trend since 2013, showing a decrease of 23% of its revenues, when 2017 audited results are compared to the audited results of 2013, as follows:

|  | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|
| Sales | $ 3,870,776 | $ 2,891,887 | $ 3,516,142 | $ 4,556,705 | $ 5,059,216 |
| Cost of Sales | 2,464,910 | 1,427,670 | 2,588,854 | 3,276,225 | 3,200,220 |
| Gross Profit | 1,405,866 | 1,464,217 | 927,288 | 1,280,480 | 1,858,996 |
| SGA Expenses | 1,243,981 | 1,203,509 | 1,190,960 | 1,350,453 | 1,375,814 |
| Operating Income | $ 161,885 | $ 260,708 | $ (263,672) | $ (69,973) | $ 483,182 |

More importantly, during 2017, and as a result of the passage of Hurricane Maria over Puerto Rico, Debtor increased its sales of Satellite Cell Phones by approximately $1,000,000. If such non-recurrent event and sales were not accounted for, 2017 sales would have been $2,900,000 approximately, resulting in a break-even operation during such year.

During 2018, (also solely as a result of the passage of Hurricane Maria over Puerto Rico) Debtor entered into two (2) special projects for the replacement of the mobile radio communications infrastructure for the local Emergency Management Agency and the local Medical Emergencies Agency, producing revenues of $2,418,000, impacting positively its 2018 financial results. These non-recurrent projects impacted Debtor's results of operations during 2018, which, again, otherwise would have been a breakeven operation. It must be underscored that for the development of such contracts, Debtor declined many small projects and small clients, due to its personnel and resources limitations. Lastly, it must also be underscored that Debtor's revenue collections are very cyclical, mostly concentrated during the last two-three months of the year with very poor collections during spring and summer time.

**4.2      Events Preceding Debtor's Chapter 11 Filing**

After a relationship of many years with Logistic Systems, Inc. ("Logistic"), during 2010 Debtor contracted Logistics, in order to assist Debtor in the development of certain specific software to provide the Government of Puerto Rico a Computer Aided Dispatch Software for its emergency management offices and for three (3) additional contracts for certain municipal police offices.

Unfortunately, the implementation of the contracts mentioned above suffered significant delays and as a result, Debtor had to incur in substantial programming efforts to be able to finish them.

A disagreement with Logistic regarding the culprit of said delays led to Debtor filing a complaint in the U.S. District Court to recover the cost of the software development done by Debtor and the incremental costs to its operations, among other causes of action.  Logistic countersued for the cost of licenses and related costs.

Due to what Debtor attributes to bad case management, Debtor's complaint was dismissed, and default was entered against Debtor, which left Debtor unable to submit any evidence in the case.

As a consequence of the above, Debtor was in the risk of an eminent judgment to be issued against it in the lawsuit set forth above (Case no. 15-02104 (BJM)), which forced Debtor to file its Chapter 11 petition.

**4.3      Debtor's Post-Petition Endeavors**

As a result of the filing by Debtor of its Chapter 11 petition, Debtor has received the benefits of 11 U.S.C. § 362(a), which stays all collection actions and judicial proceedings against Debtor (specially the case mentioned above), thus preventing a run to the courthouse by creditors who had filed and were threatening suit, providing Debtor with the opportunity to file the Plan and Disclosure Statement, without the pressures that drove Debtor to file for bankruptcy, as envisioned by the

Bankruptcy Code.

During the course of its case, Debtor has undertaken the following efforts for the benefit of its Estate and its creditors:

a.     Debtor sought and obtained the Bankruptcy Court's approval to retain Fuentes Law Offices, LLC, as its bankruptcy counsel (Docket No. 53).

b.     Debtor also and obtained the Bankruptcy Court's approval to retain Luis R. Carrasquillo, CPA, CIRA, CVA ("Carrasquillo") as its financial advisor on all matters pertaining to Debtor's Chapter 11 case (Docket No. 59).

After bankruptcy filing, the following significant events have occurred:

a.     On October 1, 2018 a motion for relief from stay was filed by Logistic Systems, Inc. ("Logistics") at Docket No. 25, which was granted by the Court at Docket No. 56.  As a consequence of the relief from stay, Logistics reopened the lawsuit between the parties at the U.S. District Court (Case No. 15-2104) and finally obtained a judgment against Debtor in the total amount of $4,161,858.38.  However, Logistics filed a motion for reconsideration on April 2, 2019 requesting the District Court to recalculate the amount, and an amended final judgment was entered in the total amount of $4,286,297.07.

b.     On November 11, 2018 Debtor and Oriental Bank filed a stipulation for the interim use of cash collateral and adequate protection at Docket No. 67.  The same was objected by Logistics at Docket No. 71, but was finally approved by the Court at Docket No. 154.

c.     On January 16, 2019, Debtor filed its initial Disclosure Statement and Plan of Reorganization at Docket Nos. 92 & 93, and the Court conditionally approved the

disclosure statement and scheduled the hearing for the final approval of the disclosure statement and confirmation of the plan for March 26, 2019.  Also, the Court extended the period to confirm Debtor's plan of reorganization until March 29, 2019.

d.   Logistics filed an application for Rule 2004 Examinations against Debtor's officers and Oriental Bank at Docket No. 108, which was granted at Docket No. 109.  Even though Oriental Bank requested an order to vacate the initial order granting said Examinations and the Court granted the same, it eventually agreed to appear to its Examination.

e.   On March 15, 2019 Logistics filed objections to the final approval of Debtor's disclosure statement and the confirmation of Debtor's plan of reorganization at Docket Nos. 131 & 132.

f.   On March 22, 2019 Debtor filed an urgent motion requesting the disqualification of Logistics' vote at Docket No. 142, which was answered by Logistics at Docket No. 148.

g.   On March 25, 2019 Logistics filed a motion to appoint a Chapter 11 Trustee at Docket No. 149.  Debtor filed a motion requesting an extension until April 29, 2019 to answer said motion, which was granted by the Court at Docket No. 170; and Debtor filed its opposition to Logistics' motion on April 29, 2019 at Docket No. 181.

h.   During the hearing held on March 26, 2019 for the final approval of Debtor's disclosure statement and confirmation of Debtor's plan of reorganization, Judge Lamoutte informed the parties that he had to recuse himself from the case.  Before recusing himself, the Court granted Debtor a period of 14 days after a new

bankruptcy Judge was assigned to amend its disclosure statement to address the limited issues stated by the Court.  See Docket No. 155.

i.    After initially assigning the case to Honorable Judge Tester, who also recused himself, the case was finally assigned to Honorable Judge Godoy at Docket No. 159.

j.    At Docket No. 160, the Court extended the period to confirm Debtor's plan of reorganization until May 31, 2019.

k.    At Docket No. 173, the Court granted Debtor an extension until April 15, 2019 to file its first amended disclosure statement.

l.    Debtor filed its First Amended Disclosure Statement on April 15, 2019 at Docket No. 175, and the Court conditionally approved said disclosure statement and scheduled the hearing for the final approval of the disclosure statement and confirmation of the plan for May 17, 2019.

m.    On May 7, 2019, Logistics filed its opposition to Debtor's First Amended Disclosure Statement at Docket No. 184.

n.    On May 17, 2019 a hearing was held in the U.S. Bankruptcy Court.  The Court decided in said hearing that the confirmation of Debtor's Plan of Reorganization was going to be held in abeyance pending the resolution of Logistics' motion for the appointment of a Chapter 11 Trustee.  After commencing the hearing, the Court vacated the same and ordered the parties to file a joint pre-trial report and the evidentiary hearing was re-scheduled for August 28 and 29, 2019.

o.    On May 28, 2019, Debtor filed its amended schedules and proceeded to amend its voluntary petition in order to eliminate the designation of small business insofar as its unsecured debts exceeded the statutory limit for a small business designation.

p.      During the August 28, 2019 hearing to discuss Logistics' request for a Chapter 11

Trustee, the Court made an initial ruling that Debtor was insolvent during the subject

periods for avoidance actions.    Thereafter, Debtor and Logistics discuss the

possibility of appointing an examiner in lieu of a Chapter 11 Trustee and requested an

additional period of time to discuss the possible agreement.  The Court continued the

hearing for October 21 and 22, 2019 pending the outcome of the conversations.

q.      On October 10, 2019, Debtor and Logistics filed a joint motion advising that no

agreement was reached and as such the hearings scheduled for October 21 and 22,

2019 should continue as scheduled.  As such, the instant Disclosure Statement shall

be further amended depending on the outcome of said hearings.

## V.    CLAIMS AGAINST DEBTOR AND ITS ASSETS

### 5.1    Claims Against Debtor

Claims against Debtor that are Allowed Claims, as defined in the Plan, will be entitled to

Distribution pursuant thereto, as indicated in pages 7 and 8 hereof.

The Plan provides that only Holders of Allowed Claims, that is, holders of Claims not in

dispute, not contingent, liquidated in amount and not subject to objection or estimation are entitled to

receive distribution thereunder. Until a claim becomes an Allowed Claim, distribution will not be

made to the holder of such claim.

### 5.2    Objections to Claims

The amounts set forth as due to holders of unclassified and classified claims are estimates

only, based upon Debtor's Schedules or Debtor's belief as to amounts due thereto. Debtor is

including as **Exhibit C** hereto a Summary of Claims and Plan Payments.

Any objections to Claims must be filed and served on the holders of Claims by the Claims Objection Bar Date, which as set forth in the Plan is the later of (1) the date that such claim becomes due and payable in accordance with its terms, or thirty (30) days before the first date fixed by the Bankruptcy Court for the hearing on the confirmation of Debtor's Plan. If an objection has not been filed to a Claim by the Claims Objection Bar Date, the Claim will be treated as an Allowed Claim.

Objections to Claims filed in Debtor's Chapter 11 case are to be prosecuted by Debtor, including any application to estimate or disallow Claims for voting purposes.

As of the date of this Disclosure Statement Debtor has not filed any objections to claims and the only claims to be objected are listed in the Exhibit C hereto.  These claims are Proof of Claim No. 12 erroneously filed by the law firm of Goldman Antonetti & Cordova, LLC and Proof of Claim No. 13 filed by Luis Ayala Heredia.

## VI.  DESCRIPTION OF THE PLAN

Debtor's Plan contemplates the continuance of its operations, the collection of its account receivable, and a Capital Contribution of its shareholders of approximately $200,000 to partially fund its Plan. With such funds, Debtor will pay on or before the Effective Date, 100% of Allowed Administrative Expense Claims, 100% of Allowed Priority Tax Claims, if any; and will pay the estimated 4.6% initial dividend to the Holders of Allowed General Unsecured Claims.

The following is a summary of the significant provisions of the Plan and is qualified in its entirety by said provisions. A copy of the Plan is being filed contemporaneously herewith.  In the event and to the extent that the description of the Plan contained in the Disclosure Statement is inconsistent with any provisions of the Plan, the provisions of the Plan shall control and take precedence. All creditors are urged to carefully read the Plan.

Except as otherwise agreed to by Debtor and the Holder of an Allowed Administrative Expense

Claim shall be paid in full by Debtor in the regular course of Debtor's business or as authorized by the Court, on or before the Effective Date.

## 6.1   Unclassified Claims

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Claims are not classified in the Plan. A description of the unclassified Claims as well as the estimated principal amounts thereof, as of the Effective Date, and their treatment, are set forth in the Plan and summarized in pages 7 and 8 hereof.

Administrative Expense Claims are generally the ordinary and necessary costs of administering and operating during a Chapter 11 case. These claims are listed in **Exhibit C** hereto.

## 6.2   Administrative Expense Claims

Except as otherwise agreed to by Debtor and the holder of a pending Allowed Administrative Expense Claim, each such holder shall be paid in full during the ordinary course of business. US Trustee Fees will be paid when due, during the pendency of the case.

If Debtor disputes any portion of an Administrative Expense Claim, Debtor shall pay such Claim within thirty (30) days after the entry of a Final Order with respect to the allowance of such disputed Administrative Expense Claim. Debtor will reserve the necessary funds to meet these payments.

## 6.3   Professional Fee Claims

The professionals retained by Debtor in its Chapter 11 case have and will incur fees and expenses from the date of their retention through the Effective Date of the Plan. It is impossible to predict the amount of professional administrative expense fees that will be incurred through the confirmation of the Plan. Debtor estimates that the total unpaid Allowed Professionals Fee Claims will account to approximately between $150,000 and $200,000 for services rendered and expenses

incurred up to the Confirmation of the Plan, for all professionals retained by Debtor.  All amounts paid to professionals through the Confirmation Date, including interim fees and expenses (if any) are subject to final Bankruptcy Court approval. Debtor reserves the right to contest the allowance of any professional fees.  Payments to Professionals will be made as approved by the Bankruptcy Court during the pendency of the Chapter 11 Case.

**6.4     Priority Tax Claims and Other Priority Claims**

Priority Tax Claims are composed of Claims entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. The Allowed Priority Tax Claims will be paid in full, in cash, on the Effective Date (see **Exhibit D**).

**6.5     Classes of Claims and Equity Interest**

As of the Petition Date, Debtor had secured claims due to Oriental Bank of Puerto Rico, Cure Claims from various unexpired executory contracts, and non-priority unsecured debts, as more particularly described below and in pages 7 and 8 hereof.  The Plan classifies the various claims against as follows:

Class 1 -  Consists of the Allowed Secured Claims of Oriental Bank de Puerto Rico.

Class 2 -  Consists of Holders of Pre-Petition Cure Claims against Debtor, arising from the assumption by Debtor of Unexpired Executory Contracts.

Class 3 -  Consists of the Holders of Allowed General Unsecured Claims.

Class 4 -  Consists of the Equity Interest Holder.

**6.6     Treatment of Claims.**

**Class 1 – Allowed Secured Claims of Oriental Bank ("Oriental")**

(a) Impairment and Voting - Class 1 is impaired under the Plan.  Oriental will be entitled to vote to accept or reject the Plan.

(b)   <u>Distribution</u> – Oriental's claims, secured by UCC filings over Debtor's cash accounts, trade accounts receivable, inventories, intangibles, and substantially all of Debtor's personal property, shall be paid in equal consecutive monthly payments of $12,786.49, with any arrears to be paid together with a balloon payment of the unpaid principal balance, due on December 31, 2025. Oriental will retain its lien encumbering its collateral until the full payment of its allowed secured claim.

**Class 2 – The Holders of Pre-Petition Cure Claims against Debtor, arising from the assumption by Debtor of Unexpired Executory Contracts**

(a)   <u>Impairment and Voting</u> - Class 2 is impaired under the Plan and is entitled to vote to accept or reject the Plan.

(b)   <u>Distribution</u> – The Allowed Pre-Petition Cure Claims arising from assumed executory contracts, will be paid as follows:

a) The claim of FirstBank consisting of a lease agreement secured by a Ford F250SD 4x4, 2018, Plate #991-208, VIN number 1FT7W2BT5JEB79043, will continue to be paid in accordance with the contractual terms for the lease, with monthly payments of $1,003, until its full payment.  Any arrears under this claim will be paid at the end of the lease.

b) The claim of FirstBank consisting of a lease agreement secured by an Acura MDX 2014, Plate #IFT-332, VIN number 5FRYD4H60EB009781, will continue to be paid in accordance with the contractual terms for this lease, with monthly payments of $1,164, until its full payment thereof.  Any arrears under this claim will be paid at the end of the lease.

c)  McGRATH Rent Corp. (dba TRS-REN TELCO) lease for various equipment will be paid in six (6) equal consecutive monthly payments of $1,011.54, commencing on the Effective Date.

### Class 3 – Holders of Allowed General Unsecured Claims

(a) <u>Impairment and Voting</u> - Class 3 is impaired under the Plan.  The members of this Class will be entitled to vote to accept or reject the Plan.

(b)  <u>Distribution</u> – The Holders of Allowed General Unsecured Claims shall be paid in full satisfaction of their claims, a pro-rata dividend in the total amount of $870,966.42 to be paid as follows:

(iii)   $200,000 on the Effective Date to be paid from the capital contribution of the shareholders and;

(iv)   $670,966.42 in 36 monthly payments commencing on the Effective Date.

The aforementioned $870,966.42 constitute a 20% dividend of the claims expected to be allowed as detailed in **Exhibit C** hereto.  As detailed below, said dividend could be increased by the Plan Administrator depending on the avoidance actions that could be filed and Debtor's actual cash receipts during the subject period of time.

In the event that the allowed claims under this class increase, the first installment to be paid as of the Effective Date as well as the monthly payments, will be adjusted and paid on a pro-rata basis to the Holders of Allowed Claims under this Class.

### Class 4 – Equity Interest Holders

(a) <u>Impairment and Voting</u> - Class 4 is unimpaired under the Plan, is not entitled to vote to accept or reject the Plan, as it is deemed to have accepted the Plan pursuant to 11USC § 1126 (g).

(b) <u>Distribution</u> – The Equity Holders will not receive any distribution under the Plan, but will retain their shares in Debtor, unaltered. They will contribute $200,000 ($100,000 each) to fund the Plan.

**6.7     Means for Implementation of the Plan**

As shown in the **Exhibit F** attached hereto, Debtor's proposed dividend to the General Unsecured Claims will be funded from Debtor's normal operations, cash available in Debtor's DIP accounts, and the capital contributions set forth above. Payments to the Holders of Allowed Administrative Expense Claims and Priority Tax Claims, if any, will be paid from the cash accumulated in Debtor's DIP Accounts. Please refer to the Cash Flows Projections attached hereto for the projected cash inflows and outflows of the Debtor, which shows the feasibility of its Plan.

Furthermore, upon confirmation of the Plan, Debtor shall appoint/hire a Plan Administrator with the following powers:

a.     The Plan Administrator shall visit Debtor at least once a month to review Debtor's cash receipts; compare them to the projections submitted in the instant Disclosure Statement; and submit a quarterly report to all creditors and parties in interest.

b.     The Plan Administrator shall review all payments made during the relevant avoidance periods and determine in his/her sole discretion the complaints to be filed taking into consideration the effect that said complaints could have in the feasibility of Debtor's Plan. The Plan Administrator shall have the sole discretion to select and appoint attorney(s) and professional(s) in order to prosecute said complaints. If any avoidance actions are filed, successfully prosecuted, and collected, the Plan Administrator shall distribute the net proceeds of said avoidance actions to Class 3 on a pro-rata basis.

    c.    The Plan Administrator shall review the total compensation packages paid to insiders and determine if these should be further reduced in order for Debtor to comply with all payments contemplated in the Plan.

    d.    The Plan Administrator shall have the power to pay an additional dividend to creditors based on Debtor's cash receipts as follows. Given the uncertainty of the special projects, if Debtor is able to obtain a special project during the reorganization period, and Debtor's cash receipts for any of the years of the reorganization period exceed $5,000,000, the Plan Administrator shall pay an additional dividend of 10% of any cash receipt in excess of $5,000,000. Said additional dividend shall be divided equally between Class 1 and Class 3, i.e. 50% for Class 1 and 50% for Class 3, and paid on a pro-rata basis within each class.

Debtor shall provide full and unrestricted access to the Plan Administrator in order for him/her to carry out the aforementioned powers, including access to Debtor's books and records.

The Plan Administrator shall be an attorney and/or certified public accountant with prior knowledge in bankruptcy and shall earn a fixed monthly payment of up to $2,000.00 throughout the three years of the Plan.

## 6.8     Debtor's Post Confirmation Management

After confirmation of the Plan, Debtor will retain the same Management, consisting primarily of Mr. Henry Barreda as its President and Secretary, and CPA Annie Astor, as Debtor's Director of Finance. Mr. Barreda's total pre-petition monthly compensation amounts to approximately $21,060, and shall remain the same after the confirmation of the Plan. Mrs. Astor's total pre-petition monthly compensation amounted to approximately $17,020; however, the same will be reduced to $12,936 upon confirmation of the Plan.

**6.9     Cancellation of Existing Agreements**

Except to the extent reinstated or otherwise provided for by the Plan, or for purposes of evidencing a right to distribution under this Plan or as otherwise provided hereunder, on the Effective Date, all agreements and other documents evidencing any Claim or rights of any holder of a Claim against Debtor, including all indentures and notes evidencing such Claims, shall be cancelled.

**6.10     Effectuating Documents and Further Transactions**

Upon entry of the Confirmation Order, Debtor shall be authorized and will be instructed to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements and documents and take such actions as may be reasonably necessary or appropriate to effectuate, implement, consummate and further evidence the terms and conditions of the Plan, including, without limitation, implementing all settlements and compromises as set forth in or contemplated by the Plan, and performing all obligations under the Plan.

**6.11     Authority to Act**

Prior to, on or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of Debtor's shareholders, security holders, officers, directors, managers, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date pursuant to the applicable laws of Puerto Rico, without any requirement of further vote, consent, approval, authorization or other action by the shareholder, security holders, officers, directors or notice to, order of or hearing before the Bankruptcy Court.

### 6.12 Executory Contracts and Unexpired Leases

All executory contracts and unexpired leases, except for those listed in Section 7.4 below (which were the only executory contracts existing prior to the bankruptcy filing), which have not expired by their own terms are deemed as rejected by Debtor, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

If the rejection of any executory contract or unexpired leases results in a claim for damages by the other party or parties to such contract or lease, any claim for such damages, if not evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, or its properties, its agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for Debtor on or before forty-five (45) days following the Confirmation Date. Debtor retains the right to object to any rejection damages claims filed in accordance with this Section. Those executory contracts listed in Section 7.4 below are deemed assumed upon confirmation.

### 6.13 Exculpation

Debtor, and its present and former members, officers, directors, representatives, shareholders, employees, financial advisors, attorneys, and agents acting in such capacity shall have no liability to any Holder of any Claim or Shareholder Interest or any other Person for any act taken or omission made after the Petition Date in connection with, or arising out of the captioned case, the Plan, the Disclosure Statement, the solicitation of votes for confirmation of the Plan, the administration of the Plan or property of the Debtor's estate distributed under the Plan, or any transaction contemplated by the Plan or the Disclosure Statement in furtherance thereof, except for willful misconduct or gross negligence, as determined by a Final Order of the Court and, in all respects, shall be entitled to rely

upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing in the Plan shall release, discharge or exculpate any non-Debtor party from any Claim owed to the United States Government or its agencies, including any liability arising under the Internal Revenue Code or criminal laws of the United States.

## VII.    LIQUIDATION AND FINANCIAL ANALYSIS

**7.1    Best Interest of Creditors and Comparison with Chapter 7 Liquidation**

In the event Debtor's Chapter 11 case is converted to Chapter 7 of the Bankruptcy Code, Debtor would be required to cease all of its reduced activities and a Chapter 7 Trustee would be appointed for Debtor's Estate to liquidate the Estate's assets pursuant to the provisions of the Bankruptcy Code, after attending to the immediate issues of securing Debtor's assets and the resolution of any issues involving Debtor's executory contracts.

A Liquidation Analysis with respect to Debtor's assets as of August 31, 2019, is attached as **Exhibit E** hereto (the "Liquidation Analysis").

The Liquidation Analysis reveals that in the event of a liquidation of Debtor's assets by a Chapter 7 Trustee, there would be a substantial loss to Debtor's Estate, considering the Chapter 7 costs of administration, the decrease in the recovery from the liquidation of Debtor's assets, and the expected value of the Estate's assets in a Chapter 7 scenario.  It also reflects what in Chapter 11 the respective Creditors are expected to receive under the Plan versus what is projected they would receive in Chapter 7, underscoring the benefits of the confirmation of the Plan and its effectiveness. Pursuant to such analysis, under a Chapter 7 scenario, the General Unsecured Creditors (all) **would not receive any dividends.  Debtor's Plan offers an estimated dividend of at least 20% to the Holders of General Unsecured Claims, more than the amount they would receive in a liquidation scenario.**

Confirmation of the Plan will ensure that holders of Administrative Expense Claims, Allowed Priority Claims, and Allowed General Unsecured Claims will receive prompt dividends on their claims, as set forth above.  The Liquidation Analysis contains estimates and assumptions that, although developed and considered reasonable by Debtor, are inherently subject to significant economic uncertainties and contingencies beyond Debtor's control that may reduce even further the recovery of the Holders of allowed claims.

**7.2      Feasibility of the Plan**

**A)   Financial Projections**

The feasibility of the Plan rests on the collection Debtor's account receivables, Debtor's continued operations, and the shareholders contributions set forth above. Debtor's Cash Flows Projections are presented in the **Exhibit F** hereto.

Moreover, as **Exhibit G**, Debtor attaches its Operating Report as of August 31, 2019, as **Exhibit H** its 2018 Audited Financial Statements, and as **Exhibit I** Debtor's Interim Financials as of August 31, 2019. Before the confirmation hearing, Debtor shall file a complete updated feasibility report performed by CPA Luis Carrasquillo.

As of the Petition Date, Debtor owned assets and had liabilities, as more particularly described in its Schedules and Statement of Financial Affairs, filed with the Bankruptcy Court on October 4, 2018 (Docket No. 29), amended on January 15, 2019 (Docket No. 89) and on May 28, 2019 (Docket No. 212).  Debtor's Schedules and Statement of Financial Affairs are available for public inspection at the office of the Clerk of the Bankruptcy Court during regular business hours.

**a)  Real Property**

As of the Petition Date, Debtor did not own any real property.

**b)  Personal Property**

As of the Petition Date, Debtor's Schedules listed Debtor's personal property consisting of cash and other financial accounts, inventories, accounts receivable, furniture and fixtures, and intangible assets.  A detail of Debtor's personal property is included in its Schedule A/B filed on October 4, 2018 (Docket No. 29), and amended on January 15, 2019 (Docket No. 89), which are available for public inspection at the office of the Clerk of the Bankruptcy Court during regular business hours.  Debtor's personal property and valuation of the same is summarized below:

1. Cash, as reflected in Debtor's operating reports as of August 31, 2019 amounted to $816,113.75. This asset value is not subject to adjustments and is available to fund Debtor's Plan and operations.

2. Accounts Receivable and Liquidated Debts - As of the August 31, 2019 (Liquidation Analysis date) Debtor had accounts receivable in the amount of $1,772,331.  However, as explained in Note D of Debtor's Liquidation Analysis attached hereto to as **Exhibit E**, 50% of them, approximately, have been due for more than one year.  The Liquidation Analysis (pages 7 through 10) explains the valuation of each category of accounts receivable and estimated the liquidation value of the same in approximately $630,413.  This considers the trade accounts, amounts due from employees, and others.

3. Vehicles – As of the filing date, Debtor was the owner of the following vehicles used in its operations:

| | |
|---|---:|
| 2002 Ford Lincoln Navigator | $  1,852 |
| 2002 Ford F-150 | 5,998 |
| 2002 Ford F-150 | 500 |
| 2003 Acura MDX | 3,995 |
| 2009 Toyota Yaris | 5,300 |
| 2009 Toyota Yaris | 5,300 |
| 2011 Ford Transit | 8,600 |
| 2012 Audi Q7 | 15,000 |

| | |
|---|---:|
| 2014 Acura MDX | 25,495 |
| 2018 Ford F250-Diesel | 57,000 |
| **Total** | **$129,040** |

4. Debtor was also the owner of certain pre-payments and deposits in the aggregate amount of $200,348. However, as further explained in Debtor's Liquidation Analysis attached hereto to as **Exhibit E**, no liquidation value is expected from these assets.

5. Included in Intangible Assets, Debtor recorded the acquisition costs of a Trade Mark purchased, many years ago (more than 10 years ago), from a related party for $844,303. Also, as shown in the table below, Debtor included in this asset category software development costs mainly composed of capitalized personnel costs involved in the development of various software, as follows:

| | |
|---|---:|
| Nx2 Software - Phase 1 | $    376,818 |
| Nx2 Software - Phase 2 | 449,980 |
| Skycall Software | 260,000 |
| SkyCad Software | 400,000 |
| Purchased Trade Mark | 844,303 |
| Total | $ 2,331,101 |

a. The NX2 – Phase 1 -  These capitalized costs, associated with Skycall and SkyCad software, are not 'shrink wrap' widely available commercial products that can be installed and configured by the end customer, but highly complex platforms that require specific engineering skillsets for correct configuration and operation. However, after an impairment test performed by Management for the audit of the year ended December 31, 2018, this asset was considered impaired and as such, written off from Debtor's books effective on such date.

b. NX2 Software – Phase 1 / Phase 2 – The NX2 Software is a specialized software platform that was designed and developed to allow the interconnection of different communications devices manufactured by JVC/Kenwood and utilizes

proprietary protocols licensed by JVC/Kenwood. This platform was exclusively developed for JVC/Kenwood Customers and is customized for each project.

c.  Skycall Software – Skycall is an integration framework that provides the development programmers the ability to create specific solutions for communications device interoperability, accountability, management and networking. Each Skycall installation is custom built and configured to end-user specifications and tailored to existing equipment. This cannot be used without further development and programming.

d.  SkyCad Software – Similar to Skycall, SkyCad is an integration framework that provides the development programmers the ability to create specific solutions for data interoperability, management, accountability, location agnosticism and networking. Each SkyCad installation is custom built to end-user specifications, existing agency operation and equipment.

In summary, each software framework requires the specific technical knowledge of key inception personnel and developers for proper preparation.   As discussed with Debtor's Management, these internally developed software programs have not been and cannot be registered because they are software that needs continuous programming, changes, and recurring maintenance. Therefore, without the expertise of Debtor's President and/or various specific engineers and programmers of the Debtor, these programs neither can be used, maintained, nor sold to any other customers.   Moreover, these costs were primarily capitalized labor and programming costs. Unfortunately, pursuant to the Generally Accepted Accounting principles, these assets are not amortized but instead, evaluated for impairment. Thus, these costs have been in Debtor's books without been amortized.  Therefore, in a Liquidation Scenario, and considering that in a Chapter 7 liquidation the services contracts of the Company are more likely than not that will be cancelled, it is Debtor's opinion that these assets will be totally impaired, without any recovery value.

Skytec, Inc.                                                                                  Case No. 18-05288 (ESL)
*Second Amended Disclosure Statement*                                                                    Page 34

6. Debtor's Going Concern Value was estimated in $519,390, as shown in the Attachment A to Debtor's Liquidation Analysis attached hereto.

### d) Liquidation Analysis

In order to analyze realistic liquidation scenarios and considering updated balances of Debtor's assets, in the Liquidation Analysis included as **Exhibit E** hereto, Debtor has utilized the value of its assets as of August 31, 2019.

### 7.3    Pending Litigation and Other Liabilities

At the time of the filing of the Chapter 11 petition, the following case was pending and was initially stayed by the provisions of Section 362(a) of the Bankruptcy Code, but as aforementioned the same was reopened pursuant to the order granting relief from the automatic stay up to the point of judgment:

| Caption of Suit and Case Number | Nature of Proceeding | Court or Agency Location | Status |
|---|---|---|---|
| Logistic Systems, Inc. vs. Skytec, Inc. 15-02104 (BJM) | Collection of Monies | US District Court for the District of Puerto Rico | Judgment Entered |

### 7.4    Leases and Contracts

As of the Petition Date, Debtor was a party to the following unexpired leases as set forth in Debtor's Schedule G, filed at the Bankruptcy Court:

| Name and Mailing Address, including Zip Code, of other Parties to Lease or Contract | Description of Contract of Lease and Nature of Debtor's Interest. |
|---|---|
| FirstBank of Puerto Rico | Lease Agreement secured by a Ford F250SD 4x4, 2018, Plate #991-208, VIN number 1FT7W2BT5JEB79043 – **To be Assumed upon confirmation of the Plan.** |
| FirstBank of Puerto Rico | Lease Agreement secured by an Acura MDX 2014, Plate #IFT-332, VIN number 5FRYD4H60EB009781 – **To be Assumed upon confirmation of the Plan**. |
| Royal Properties, Inc. | Lease Agreement – Debtor's Administrative Offices – This contract expired by its own terms before the bankruptcy filing and has been on a month to month basis ever since.  A new lease agreement will be executed upon confirmation of the Plan**.** |

Skytec, Inc.                                                                    Case No. 18-05288 (ESL)
*Second Amended Disclosure Statement*                                                    Page 35

| Henry Barreda | Lease for Communications Tower Space deemed as part of Mr. Barreda's compensation – **To be Assumed upon confirmation of the Plan.** |
| McGrath Rent Corp. dba TRS-REN TELCO | Equipment lease Agreement: **To be Assumed upon confirmation of the Plan**. |

**7.5    Pre-petition Transfers**

As part of Debtor's fiduciary duties, it examined and evaluated all payments made to creditors during the ninety (90) days prior to the bankruptcy petition date and all payments made to insiders or for the benefit of insiders within one (1) year prior to the bankruptcy petition.  During such periods, payments in the total amount of $2,119,196 were made to creditors within 90 days from the bankruptcy filing; payments in the total amount of $761,330.98 were made to insiders within one year from the bankruptcy filing; and payments in the total amount of $350,675.85 were made to the benefit of insiders within one year from the bankruptcy filing.

As aforementioned, the Plan Administrator shall have the power to determine which avoidance actions should be prosecuted taking into consideration the impact, if any, on Debtor's financial projections and the payments contemplated in the Plan.

**VIII.    BAR DATE AND DETERMINATION OF CLAIMS**

**8.1    Bar Date**

On September 13, 2018, in the "Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors and Deadlines" in Debtor's case, the Bankruptcy Court fixed January 17, 2019, as the bar date for the filing of Proofs of Claim, except for Governmental Units, and March 12, 2019, for such filings by Governmental Units.

**8.2    Determination of Claims**

The Plan specifies procedures for objecting to claims.  Debtor and any other entity authorized under the Bankruptcy Code may object to Claims within thirty (30) days before the first date fixed

by the Bankruptcy Court for the hearing on the confirmation of the Plan. No payments will be made under the Plan on account of Disputed Claims until their allowance by the Bankruptcy Court. The Plan provides that Distributions on Disputed Claims will be held in reserve until the Disputed Claims are allowed (at which time the reserves will be distributed and the Claims will be treated according to the terms of the Plan), or disallowed (at which time the reserves will be distributed on account of Allowed Claims pursuant to the terms of the Plan).

Any Claims which (a) are not listed as an Allowed Claim on Debtor's Schedules, as amended; (b) are not evidenced by a valid, timely filed Proof of Claim; or (c) are not listed in the Plan or exhibits to the Plan as Allowed Claims, shall not receive any distribution of cash or property under the Plan until the same become Allowed Claims, and shall be disallowed and discharged if they are not Allowed by Order of the Bankruptcy Court.

## IX.  ALTERNATIVES TO THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) Debtor's liquidation under Chapter 7 of the Bankruptcy Code, (b) dismissal of Debtor's Chapter 11 Case, or (c) the proposal of an alternative plan.

### A.    Liquidation Under Chapter 7

If a plan cannot be confirmed, the Case may be converted to Chapter 7 of the Bankruptcy Code.  In such an event, a trustee would be elected or appointed to liquidate Debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.

As set forth in the Liquidation Analysis attached as **Exhibit E** hereto, Debtor believes that conversion of the Case to Chapter 7 of the Bankruptcy Code would result in a limited distribution to creditors (none for the Unsecured Creditors), due to the decreased value of Debtor's assets, the unfamiliarity of a trustee with Debtor's business and assets and with the manner of most effectively

disposing of the same, the carrying costs of certain assets such as insurance, property taxes, etc., the extended security agreement of the secured creditor in the case, and the delay in distribution on account of such conversion.

Thus, Debtor believes that the interest of creditors and the goals of Chapter 11 are better served by the confirmation of the Plan.

**B.     Dismissal of the Case**

Dismissal of the Case would likely create substantial problems for Debtor and parties' interest, including a run to the courthouse, which would result, in an abandonment of the orderly and structured equitable payments provided by the Plan.  Therefore, dismissal of the Case is not a viable alternative for creditors.

**C.     Alternative Plan of Reorganization**

If the Plan is not confirmed, at present, Debtor does not foresee a different plan. Debtor believes that the Plan described herein will provide the greatest and most expeditious return to creditors.

# X.   TAX EFFECTS

Based on Debtor's net operating loss carry forwards, the provisions of the Puerto Rico Internal Revenue Code of 2011, as amended, and the tax provisions of the Bankruptcy Code, Debtor expects that the implementation of the Plan will not have any tax effects.

# XI.   CONCLUSION

Debtor submits that the Plan is fair and reasonable and in the best interest of the Estate and Creditors and offers the best possible recoveries for Creditors under the circumstances.  Debtor, therefore, urges creditors to vote in favor of the Plan.

San Juan, Puerto Rico this 17th day of October, 2019.

**By:** _____

**President**