**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE: | CASE NO. 18-05288 (EAG) |
| SKYTEC, INC., | CHAPTER 11 |
| DEBTOR. | FILED & ENTERED ON 11/20/2019 |

**OPINION AND ORDER**

Pending before the court is a motion to appoint a chapter 11 trustee brought by creditor Logistic Systems, Inc. ("Logistic" or the "movant") and the opposition to it filed by Skytec, Inc. ("Skytec" or the "debtor"). For the reasons stated below, the court denies Logistic's motion.

**I. Procedural History.**

Skytec is a Puerto Rico corporation in the telecommunications field that works mostly with emergency-services agencies in Puerto Rico. Logistic is a Montana corporation that designs and sells computer applications and information-management systems for the public safety sector.

Beginning in or around January 2005, Skytec and Logistic undertook a series of projects together in Puerto Rico. Issues eventually arose between the companies, and Skytec sued Logistic in July 2015 in the Puerto Rico Court of First Instance, Bayamon Part, seeking injunctive relief and damages for breach of contract. See Case No. D PE2015-0565. Logistic removed the case to the district court and counterclaimed for breach of contract and breach of implied covenant of good faith and fair dealing. (Civ. Case No. 15-02104, Dkt. Nos. 1, 8 & 14.)

After protracted litigation, the district court entered an opinion and order on September 12, 2018 dismissing Skytec's claims with prejudice and entering default as to

Logistic's counterclaims. (Civ. Case No. 15-02104, Dkt. No. 160.) The court did so as a sanction for Skytec's "deliberate" and "extensive" "misbehavior and obstructionism during the discovery process." (Civ. Case No. 15-02104, Dkt. No. 160 at pp. 9, 11.) Per the district court's opinion and order, Skytec had repeatedly missed discovery deadlines and had ignored several orders to comply, leading the court to first exclude Skytec's expert witness. (Civ. Case No. 15-02104, Dkt. No. 160 at p. 4.) A hearing on damages was set for a later date. Id.

Later that afternoon, Skytec filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, staying the district court case.[1] (Dkt. No. 1.) On November 13, 2018, however, the bankruptcy court modified the automatic stay as to Logistic to allow the action before the district court to continue to judgment. (Dkt. Nos. 25 & 26.)

On March 15, 2019, the district court entered judgment against Skytec in the amount of $4,161,858.38. (Civ. Case No. 15-02104, Dkt. No. 186.) This judgment was amended on May 23, 2019 to $4,286,297.07. (Civ. Case No. 15-02104, Dkt. No. 189.) Logistic has amended its proof of claim in the bankruptcy case to reflect the amended judgment amount. (Claims Register No. 9-3.)

On March 25, 2019, Logistic filed a motion to appoint a chapter 11 trustee.[2] (Dkt. No. 149.) Skytec opposed, and both parties have since replied. (Dkt. Nos. 181, 187 & 199.)

---

[1] Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended. All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure, and all references to "Rule" are to the Federal Rules of Civil Procedure. All references to "Local Bankruptcy Rule" are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico. And all references to "Local Civil Rule" are to the Local Rules of Civil Practice of the United States District Court for the District of Puerto Rico.

[2] The following day, on March 26, 2019, the judge assigned to the bankruptcy case recused himself. (Dkt. No. 155.) The case has since been reassigned to the undersigned. (Dkt. No. 160.)

The matter, together with the final approval of the amended disclosure statement and confirmation of the amended plan, was originally set for a hearing on May 17, 2019. (Dkt. No. 178.) At the hearing, however, the bankruptcy court determined that the joint pretrial report filed by the parties was insufficient given the complexity of Logistic's factual allegations. (Dkt. Nos. 202 & 207.) The court ordered the parties to file an amended joint pretrial report to narrow the factual controversy and continued the evidentiary hearing. Id. As to the disclosure statement and confirmation of plan, the debtor subsequently amended the petition to change its designation to a non-small business case and has since filed a second amended disclosure statement and plan. (Dkt. Nos. 214, 249 & 250.)

At the hearing held August 29, 2019, the court made an initial ruling that "the debtor was insolvent within the 90-day preference period prior to the bankruptcy and also within the one-year period for preferential payments made for the benefit of insiders." (Dkt. Nos. 235 & 236.) Following this ruling, the parties requested a recess to discuss settlement. The parties briefly met in chambers, and the hearing was continued, at the parties' request, to allow time to reach an agreement. Id. Those settlement efforts, though, were ultimately unsuccessful. (Dkt. No. 246.)

The continued evidentiary hearing took place on October 21 and October 22, 2019. (Dkt. Nos. 253, 254, 261 & 262.) The court heard testimony from Annie Astor Muñoz, the debtor's CFO; Henry Barreda Rivera, the debtor's president; certified public accountant Carlos Baralt Benítez ("CPA Barralt"), Logistic's expert witness; and certified public accountant Luis Carrasquillo Ruiz ("CPA Carrasquillo"), the debtor's expert witness. At the conclusion of the hearing, the court took the matter under advisement.

**II. Jurisdiction.**

This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a), Local Civil Rule 83K(a), and the General Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of Puerto Rico, dated July 19, 1984 (Torruella, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

**III. Findings of Fact.**

After careful consideration of the stipulated facts contained in the parties' amended joint pretrial report, the witnesses' testimonies, and the contents of the documents introduced as evidence, the court makes the following findings of fact and conclusions of law pursuant to Rule 52(a), made applicable to this proceeding by Bankruptcy Rules 7052 and 9014:

Skytec and Its Officers

Skytec is a privately held Puerto Rico corporation "primarily engaged in the sale and installation of communications, emergency, and security systems," as well as in "software development and integration." (Dkt. No. 251 at p. 1.) Among other things, Skytec manages the emergency-communication systems in Puerto Rico. The company is also a supplier of federally funded communications and automatic vehicle locator products to the Puerto Rico government, its agencies and municipalities. (Debt. Ex. E at p. 4.)

Skytec has two shareholders, Henry Barreda Rivera and Miguel Jose Carbonell. Mr. Barreda is Skytec's president and one of its founders. He supervises the daily operations of the company. (Dkt. No. 251 at p. 4.) Mr. Barreda has a strong background in technology, communications and programming, and he personally heads business development for the company, building and maintaining relationships with Skytec's clients, who are mainly the

directors of various emergency agencies in Puerto Rico. As part of his role at Skytec, Mr. Barreda meets with and analyzes the needs of clients, develops and designs products to address those needs, and then integrates the different aspects of the products designed by his programming team to best suit the end user.

Annie Astor Muñoz, who is married to Mr. Carbonell, is an independent contractor who serves as Skytec's chief financial officer. (Dkt. No. 251 at p. 4.) She provides services to the debtor through M&A CPA Advisor, Inc. Ms. Astor works full-time for Skytec, where she oversees and manages the company's financial affairs. (Dkt. No. 251 at p. 5.) She has been with the company since 2009. In her role as CFO, Ms. Astor maintains relationships with financial institutions, helps the debtor obtain loans or cash from private investors to continue its operations and fund projects, coordinates and negotiates payments to suppliers, and provides the requisite information to external auditors. She has also at times extended cash advances to the debtor in order to meet payroll. Since the filing of the bankruptcy case, Ms. Astor has aided in the preparation of the monthly operating reports and other required financial disclosures.

Mr. Barreda and Ms. Astor's Compensation

Mr. Barreda's total monthly compensation is approximately $21,060.57. (Dkt. No. 251 at p. 11.) His compensation package includes a base salary, health and life insurance premiums, as well as two car leases, one of which is for his wife, who does not work for the debtor. In addition, Skytec pays the mortgage for a property owned by Mr. Barreda that it does not use. At the hearing, Mr. Barreda testified–and this court found credible–that this property is not listed under his name in the property registry due to an ongoing issue with the property

lines. This was brought to his attention recently, and he is working with his attorneys to correct it. Ms. Astor's total monthly compensation, through M&A CPA Advisor, Inc., is approximately $17,327.51, comprised of a base salary, health and life insurance premiums, as well as a car lease. (Dkt. No. 251 at p. 11.)

There is no corporate resolution memorializing Mr. Barreda's or Ms. Astor's compensation packages, nor does Ms. Astor have a written independent contractor agreement with Skytec. (Dkt. No. 251 at p. 6.) There is also no written agreement regarding the payment of the mortgage for the property owned by Mr. Barreda.

Neither Mr. Barreda's nor Ms. Astor's compensation has changed since the filing of the bankruptcy case. There are no plans to change Mr. Barreda's compensation going forward. As for Ms. Astor, the second amended disclosure statement indicates that her monthly compensation will be reduced to $12,936.00 upon confirmation of the plan. (Debt. Ex. C at p. 26.)

When asked why certain aspects of Mr. Barreda's and her compensation are not reflected in one part of Skytec's tax returns, Ms. Astor testified that this is because she understands that it is not required to be reported there. (Dkt. No. 251 at p. 7.) Specifically, when shown Skytec's tax returns for the years 2014 through 2017, which lists on one line the compensation for officers as $0, Ms. Astor clarified that this line has no bearing on the income taxes paid by the debtor, and she maintains that all compensation for Mr. Barreda and herself is properly disclosed and included elsewhere in the return to the extent necessary. (Log. Exs. 31-34.)

Ms. Astor went on to note that the Puerto Rico Department of Treasury is not a creditor in this case, and that Skytec owes only a minimal amount to the Internal Revenue Service. In addition, Ms. Astor stated that Skytec's financials are routinely audited by the federal and Puerto Rico governments as part of the bidding and accreditation process, and that Skytec is required to file financial certifications periodically in order to be eligible for government contracts. The court finds Ms. Astor's testimony on these matters to be credible.

Special Projects

In describing Skytec's business, Mr. Barreda, Ms. Astor, and CPA Carrasquillo differentiated between recurring business and special projects. Ms. Astor testified that the company's recurring business is mostly comprised of maintenance contracts, licensing agreements, and equipment sales. She and CPA Carrasquillo explained that the recurring business is cyclical in nature, and that payment on these contracts is usually weighted toward the fourth quarter of the year. (Debt. Ex. E at p. 1.)

Special projects, on the other hand, are on an ad hoc basis, and typically involve the installation of communication systems or interoperability projects. Mr. Barreda testified that Skytec was usually hired for one or two special projects per year. These projects are very resource intensive and require special arrangements with Skytec's suppliers. They also require significant cash on hand to cover the startup costs.

Following the passage of Hurricane María in September 2017, the Puerto Rico Emergency Management Administration hired Skytec for a special project to begin reconstruction of the government interoperability emergency systems. In order to complete the project, Skytec needed to first obtain loans from private lenders and make special

arrangements with its suppliers. Per Mr. Barreda's and Ms. Astor's testimony, these agreements called for the lenders and suppliers to be paid after the project was completed as soon as the funds from the same were collected from the various agencies. CPA Carrasquillo's report echoes their testimony, stating that Skytec's "ordinary course of business was and is to pay . . . its private lenders' loans and certain accounts payable based on its collections cycle, *to wit*, immediately after performing the collections from any special project or when the governmental agencies contracts revenues are collected." (Debt. Ex. E at p. 2.)

With regard to suppliers, Mr. Barreda testified that clients did not always pay Skytec timely for its services, including for special projects. To maintain Skytec's relationship with its suppliers, Mr. Barreda met with the company's main suppliers to explain the situation, and entered oral agreements with those suppliers that they would be paid as soon as Skytec was paid. This is referred to as a "pay when paid" agreement. As a result, as Ms. Astor explained, while written invoices from Skytec's suppliers might provide for a 30-day repayment term, those suppliers that had long-standing relationships with Skytec understood that the actual payment term depended on when Skytec was paid by its clients. The court finds Mr. Barreda's and Ms. Astor's testimony, and CPA Carrasquillo's expert report, regarding Skytec's ordinary course of conduct regarding the payment to suppliers to be credible.

For example, one of Skytec's suppliers for the Hurricane María special project was Daniels Electronics LTD. Ms. Astor testified that the Emergency Management Agency paid Skytec more than one million dollars in early September 2018. She stated that as soon as Skytec received those funds, she paid Daniels and other suppliers. This is reflected in Skytec's bank statement for September 2018, which show deposits totaling $1,233,975.56 into Skytec's

8

account on September 5, 2018, and payments shortly thereafter to various suppliers and other creditors, including to Daniels Electronics LTD in the amount of $344,699.90, issued September 10, 2018, just two days prior to the bankruptcy filing. (Log. Ex. 59.)

As to the private loans, Ms. Astor testified that Skytec at times needed to obtain financing from private individuals because the company was unable to access traditional financing from banks due to its large loan with Oriental Bank. Ms. Astor had a network of private lenders drawn from her personal contacts. She testified that without these loans, Skytec would not be able to competitively bid and complete special projects. In 2018, Ms. Astor raised $700,000.00 in such private loans in order to complete the Hurricane María special project. Ms. Astor testified, and CPA Carrasquillo's report stated, that Skytec's ordinary course of business was to repay such loans as soon as possible after Skytec was paid by the client, again as part of a "pay when paid" agreement, and that this had been the procedure for private loans obtained in the same manner during 2016 and 2017. (Debt. Ex. E at p. 6.) Per CPA Carrasquillo, the loan documents themselves specifically state that the loans will be repaid when payment was received by Skytec. Id.

The Hurricane María special project earned gross revenues for Skytec of $2,418,000.00. This amount, which Skytec collected during July, August, and September 2018 (during the 90-day preference period), represented nearly 40% of the total revenue earned by the debtor for the year. (Debt. Ex. E at p. 5.) This is reflected in the debtor's bank statement for September 2018. (Log. Ex. 59.) Ms. Astor testified that upon receipt of that revenue, Skytec immediately made payments to both its suppliers and its private lenders, per the terms of the agreements reached with those parties. CPA Carrasquillo stated in his report that "most (90%) of the

9

payments made during the 90 days prior to the filing date" were made per these "pay when paid"agreements with lenders and suppliers, demonstrating that this pattern was debtor's ordinary course of business and/or that the payments were made in "contemporaneous exchange of value." (Debt. Ex. E at p. 2.)

As Logistic's expert CPA Barralt testified, a portion of the checks to those parties were issued prepetition but honored by the bank after Skytec had already filed its bankruptcy petition. (Log. Ex. 70.) Specifically, CPA Barralt testified, and his expert report reflects, that "prepetition payments totaling approximately $638,000 were cleared by the bank for payment post-petition." Id. Of this amount, $46,696.10, including a $35,000.00 bonus awarded to Ms. Astor for her role in securing private financing for the Hurricane María special project, cleared the bank on September 12, 2018, the date the bankruptcy petition was filed. Id. The court finds CPA Barralt's testimony on this matter to be credible.

Disclosure Statement and Plan

On October 17, 2019, the debtor filed a second amended disclosure statement and plan. (Debt. Exs. C & D.) The debtor's second amended plan provides to general unsecured claimants, a class composed almost entirely of Logistic's claim, a dividend in the total amount of $870,966.42, of which $200,000 would be paid on the effective date through capital contributions from the debtor's shareholders, with the remaining amount being paid in monthly installments over three years. (Debt. Ex. D at p. 12.) This dividend represents 20% of the expected allowed claims in this class. Id.

The plan also calls for the appointment, upon confirmation, of a plan administrator tasked with reviewing the debtor's cash receipts on a monthly basis and submitting a quarterly

report to all creditors and parties in interest.  (Debt. Ex. D at p. 13.)  The plan administrator

would also review all payments made during the 90-day and one-year preference periods and

determine whether to bring preference actions to recover any of those amounts.  Id.  In doing

so, the plan administrator would "tak[e] into consideration the effect that said complaints

could have in [sic] the feasibility of the Debtor's plan." (Debt. Ex. D at pp. 13-14.)  Whatever

amounts the plan administrator was able to recover would be distributed to general unsecured

claimants.  Id.  The Plan administrator would also review the total compensation packages paid

to the insiders to determine if any should be reduced.  (Debt. Ex. D at p. 14.)  The Plan further

provides that if the debtor were to be hired for a special project during the reorganization

period, and if the debtor's cash receipts during any year during the reorganization period

exceeded $5 million, then the plan administrator would pay an additional 10% dividend on any

cash receipts in excess of the $5 million, divided equally between Oriental Bank's secured

claim and the general unsecured creditors.  Id.  Per the second amended disclosure statement,

Ms. Astor's total monthly compensation will be reduced from approximately $17,020.00 to

$12,936.00 upon confirmation.  (Debt. Ex. C at p. 26.)

Ms. Astor's testified that Oriental Bank is in favor of the second amended plan.  Oriental

voted in favor of the previous amended plan, and the second amended plan does not adversely

change the treatment as to this creditor.  (Dkt. No. 126; Debt. Ex. D at pp. 10-11.)

Effect of Appointment of a Trustee on Skytec's Reorganization Efforts

Mr. Barreda testified that the appointment of a chapter 11 trustee and/or a prolonged

chapter 11 case would significantly hinder Skytec's business and reduce its chances for a

successful reorganization.  First, it would weaken the company's chances of obtaining

traditional financing to compete for bids or complete projects. Second, government contracts require bidders to obtain performance bonds, and it is very difficult for companies in bankruptcy to obtain such bonds. By way of example, Mr. Barreda testified that Skytec has been able to obtain only one performance bond post petition, and that the bonding company had required a $200,000.00 deposit. Mr. Barreda explained that Skytec will need to send updated financial reports to local and federal government agencies by February 2020, and that if there is no confirmed plan in place at that time showing Skytec's road to exiting bankruptcy, that it would be very difficult–if not impossible–for the company to win any new projects.

## IV. Legal Discussion.

Section 1104(a) provides that on request of a party of interest or the United States Trustee "[a]t any time after the commencement of the case but before confirmation of a plan," the court shall order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management" or "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a). "The appointment of a trustee is an extraordinary remedy and should be analyzed on a case-by-case basis to determine whether 'cause' exists." In re Costa Bonita Beach Resort, 479 B.R. 14, 44 (Bankr. D.P.R. 2012). The appointed trustee takes over, displacing and divesting the debtor of all control of and possession of property of the estate. In re Waterworks, Inc., 538 B.R. 445, 465 (Bankr. N.D. Ill. 2015). There is a strong presumption that a debtor should be permitted to remain in control and possession of its business. 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶1104.02[3(b)(i)] (16th ed. 2014).

Logistic bears the burden of proving that cause exists for the appointment under section 1104(a)(1), but section 1104 does not establish what standard of proof a movant must meet to show cause. Courts are split on whether to apply the preponderance-of-evidence or clear-and-convincing-evidence standard, but the majority have held that the movant must demonstrate cause by clear and convincing evidence. 7 Collier on Bankruptcy, at ¶1104.02[4(b)]; In re Bayou Group, LLC, 564 F.3d 541, 546 (2d Cir. 2009); In re G-I Holdings, Inc., 385 F.3d 313, 317-18 (3d Cir. 2004) (explaining that heavy "presumption" against appointment of outside trustee refers to heavy burden of persuasion by clear and convincing evidence that party moving for appointment must bear.) This court agrees with the majority view that a debtor's presumptive right to maintain possession over the reorganizing business is an important interest justifying the heightened burden of clear and convincing evidence. At any rate, the debate is immaterial here because the court finds that the appointment of a trustee in this case is not warranted under either standard.

Logistic argues that there are grounds for the appointment of a chapter 11 trustee under section 1104(a)(1) and 1104(a)(2). (Dkt. No. 149 at pp. 14-26.) Under section 1104(a)(1), Logistic contends that there is "cause" to appoint a trustee in this case due to Skytec's gross misconduct, both pre- and post-petition, as well as the debtor's gross mismanagement of its corporate assets. (Dkt. No. 149 at pp. 14-19.) Specifically, Logistic points to the opinion and order entered in the district court litigation detailing the debtor's "extreme misconduct" during that case. (Dkt. No. 149 at p. 15.) Post-petition, Logistic also cites to Skytec's decision not to pursue avoidance actions against transfers made for the benefit of Skytec's insiders and affiliates. (Dkt. No. 149 at pp. 15-18.) As to its gross

mismanagement claims, Logistic takes issue with the compensation packages given to Mr. Barreda and Ms. Astor despite Skytec's struggles, as well as the debtor's decision not to pursue the alleged voidable transfers.  (Dkt. No. 149 at pp. 18-19.)

As to section 1104(a)(2), Logistic asserts that the appointment of a trustee is in the best interest of creditors, equity holders, and the estate due to conflicts of interest that prevent the debtor from pursuing avoidance actions in which insiders benefitted from the transactions and debtor's status as a purported creditor to affiliates owned by one or both equity holders.  (Dkt. No. 149 at pp. 19-26.)  Logistic maintains that the benefits of appointing a chapter 11 trustee in this case far outweigh the costs, since any funds recovered from the avoidance actions and saved by limiting the insiders' compensation would go to Skytec's creditors.  (Dkt. No. 149 at pp. 25-26.)

In its opposition, Skytec, among other things, counters that the transactions in question do not qualify as preferential transfers because the payments were made in the ordinary course of business under "pay when paid" agreements with suppliers and lenders, they were not made on account of antecedent debts, and because the debtor was solvent during the 90-day and one-year preference periods.[3]  (Dkt. No .181 at pp. 2-3.)  The debtor also disputes that the insiders' compensation is excessive.  (Dkt. No. 181 at pp. 3-7.)

---

[3] The court has, in effect, already rejected the last ground raised by Skytec when it  ruled during the August 29, 2019 hearing  that "the debtor was insolvent within the 90-day preference period prior to the bankruptcy and also within the one-year period for preferential payments made for the benefit of insiders."  (Dkt. Nos. 235 & 236.)

Claims Under Section 1104(a)(1)

    (a)    District Court Case

Turning first to Logistic's grounds under section 1104(a)(1), this court declines to find that the debtor's prepetition misconduct described by the district court in its September 12, 2018 opinion and order merits a finding of cause for the appointment of a trustee in this bankruptcy case.  In so holding, this court takes into account that the debtor was already sanctioned quite significantly during the district court case for its misconduct, which directly resulted in the dismissal of Skytec's claims and the entry of default as to Logistic's counterclaims.  And, this court also bears in mind that to the extent that the delays in the production of discovery and other misconduct were attributable to Skytec's district court counsel, as the debtor maintains, that Skytec is represented by different counsel in this bankruptcy proceeding and no similar allegations have been brought against the debtor in this case.

    (b)    Preferential Transfers

Regarding Logistic's concerns that the debtor has refused to investigate and prosecute preference actions, the court notes at the outset that Logistic's argument is somewhat negated by the proposals contained within Skytec's recently filed second amended plan.  (Debt. Ex. D.) As outlined more thoroughly above, the debtor's proposed plan now directly addresses the issue of voidable transfers, calling for the appointment of a plan administrator upon confirmation whose role, among other things, would be to review all payments made during the relevant preference periods and determine whether to bring any preference actions, weighing the effect such lawsuits would have on the debtor's reorganization efforts.  (Debt. Ex.

D at pp. 13-14.)  Any amounts recovered in such actions would be distributed to general unsecured claimants.  Id.

As to the potential preference actions themselves, in its motion to appoint a trustee, Logistic identified payments made during either the 90-day or one-year preference period totaling $1,303,325.30 that it claims are preferential transfers, mostly comprised of $485,392.08 in payments to suppliers on account of antecedent debt, $664,506.13 in loan repayments to private investors, and $122,509.75 in payments made by credit cards belonging to insiders. (Dkt. No. 149 at pp. 3-5; Dkt. No. 149-2 at p. 1.)  The balance is made up of smaller payments made for legal and accounting fees.  Id. Logistic based these numbers on disclosures made by the debtor in its statement of financial affairs.  (Dkt. No. 29 at pp. 38-42, 44-45.)

At the evidentiary hearing, Logistic elected not to call an expert witness to provide analysis as to which payments, and in what amounts, qualified as preferential transfers. Logistic did call their expert witness, CPA Barralt.  However, his testimony was mostly limited to the narrower question of whether certain transactions cleared the bank post-petition, which Logistic argues would make them subject to the less exacting standards of section 549.[4]  While Logistic may have been relying on CPA Barralt's testimony to challenge CPA Carrasquillo's expert report, CPA Barralt gave no firm opinion, in his testimony or his expert report, quantifying the amount of preferential transfers the debtor should be seeking to void.  This is perhaps because in his testimony and his expert report, he was careful to point out the limitations of his review of CPA Carrasquillo's report.  He stated that as to special payment

---

[4]/The bulk of CPA Barralt's expert report concerned the debtor's solvency. (Log. Ex. 70 at pp. 4-8.) This analysis was rendered moot by the court's determination during the August 29, 2019 hearing that the debtor was insolvent during the relevant preference periods.  (Dkt. Nos. 235 & 236.)

arrangements to suppliers, that "[t]he information made available . . . does not allow the verification of such special arrangements." (Log. Ex. 70 at p. 10.) As to business expenses paid by Skytec's officers on their personal credit cards, Mr. Barralt stated that "[i]t is difficult to determine whether all credit card charges paid by [d]ebtor were for business expenses." Id. Further, with regard to payments to insiders, Mr. Barralt simply stated "I am not addressing these legal issues in this report." Id. Given these limitations, the court finds that Mr. Barralt's testimony is of limited probative value in determining what preference actions the debtor should be pursuing.

The court did hear testimony, though, from Skytec's expert, CPA Carrasquillo, who testified that his analysis of all transactions during the relevant preference periods yielded voidable transfers totaling $253,516.93, a significantly lower figure than the one put forth by Logistic. (Debt. Ex. E, attachment Z.) CPA Carrasquillo's analysis focused particularly on three categories of transactions: loan repayments, supplier payments, and credit card repayments. The remainder of the payments during the period in question dealt with taxes, medical and life insurance premiums, telephone and communications bills, rent, utilities, legal and audit fees, and other assorted expenses. (Debt. Ex. E.) He performed his analysis of transactions during the 90-day preference period primarily by examining the check registers from June to September 2018. (Debt. Ex. E at p. 7.)

With regard to loan repayments, CPA Carrasquio opined that these payments did not constitute voidable transfers since "these payments were made in the ordinary course of business, in accordance with the terms and conditions of the loans." (Debt. Ex. E at p. 8.) As to supplier payments, CPA Carrasquillo determined that amounts owed to suppliers for the

17

purchase of equipment needed for the Hurricane María special project did not qualify as voidable transfers since those transactions either were made at the moment equipment was purchased, and thus constituted a contemporaneous exchange of value, or "were paid in accordance with the terms and conditions agreed to with the respective suppliers, when the funds from those projects were collected." (Debt. Ex. E at pp. 8-9.) Regarding the credit card repayments, CPA Carrasquillo excluded payments made by the debtor's officers through their personal credit cards of necessary equipment or expenses incurred in the ordinary course of business only after matching the credit card statements to invoices sent to Skytec by its suppliers. (Debt. Ex. E at pp. 7-8.) Credit card payments of other business expenses that were on account of antecedent debts were included in CPA Carrasquillo's list of voidable transfers. Id. The court finds CPA Carrasquillo's methodology to be credible and reasonable.

The court makes clear that it is not here making any legal determination regarding whether any specific transaction qualifies as a preferential transfer. None of the counterparties to the transactions in question are party to this contested matter, so any such determination would violate that party's due process rights. That being said, the court is satisfied that the debtor has thoroughly investigated the matter, given the thoroughness of CPA Carrasquillo's report, and that the issue is more nuanced than Logistic asserts. Coupled with the debtor's proposal in the second amended plan to appoint a plan administrator to investigate, among other things, exactly this topic, the court does not find that Logistic established cause for the appointment of a trustee on this issue.

(c)    Excessive Compensation

Regarding Logistic's contention that Skytec has not taken steps to reduce excessive compensation to insiders, Logistic argues that Mr. Barreda's and Ms. Astor's compensation packages are too generous and questions why there are no written contracts reflecting their agreements.   Logistic also takes issue with certain aspects of Mr. Barreda's and Ms. Astor's compensation, which include car payments for both Mr. Barreda and Ms. Astor, as well as for Mr. Barreda's wife, and the payment of a mortgage on a property owned by Mr. Barreda.

The court first notes that it does not find it particularly alarming that in a closely held company the executive contracts were not memorialized in writing.   Further, while the structure of the compensation may be somewhat unusual, the parties do not dispute that Mr. Barreda's total monthly compensation is approximately $21,060.57 and Ms. Astor's is approximately $17,327.51.   (Dkt. No. 251 at p. 11.) Logistic presented no evidence during the hearing to support its position that either amount is excessive.  To the contrary, the witnesses' testimonies demonstrate that both Mr. Barreda and Ms. Astor serve important roles in Skytec. Mr. Barreda, in particular, is critical to Skytec's viability.  He is charged with, among other things, seeking out new business, meeting with clients to determine their needs, designing a solution with both hardware and software components, and integrating the designs of his team of programmers into a cohesive solution.  Without Mr. Barreda, it is not clear how the debtor's business could continue.  Likewise, the evidence at the hearing showed that Ms. Astor's role is beyond that of the typical CFO.  For instance, she testified that she was able to raise $700,000.00 in 2018 solely through her network of private lenders, which was essential to completing the Hurricane María special project.  This project resulted in approximately $2.4

19

million in gross revenue for the debtor. In any event, per the second amended disclosure statement, Ms. Astor has already agreed to accept a significant reduction in compensation upon the confirmation of the plan, with her monthly compensation being reduced from approximately $17,000.00 to $12,936.00. (Debt. Ex. C at p. 26.) And, under the terms of the proposed plan, the plan administrator would evaluate whether any other reduction in compensation for any of the insiders is warranted. (Debt. Ex. D at p. 14.)

(d)　　Gross Mismanagement

Outside of the preferential transfer and compensation issues, Logistic also raises more general claims that the debtor's gross mismanagement establishes "cause" for the appointment of a trustee. (Dkt. No. 149 at pp. 18-19.) At the evidentiary hearing, Logistic appeared to argue that Skytec's tax returns were improperly prepared because they did not include all compensation paid to Mr. Barreda and Ms. Astor, and that this omission signaled some misconduct on the part of Ms. Astor or the debtor generally. The evidence does not support this assertion, however. Ms. Astor explained, credibly, that the part of the tax return referenced by Logistic had no bearing on the company's tax liability, and that all compensation paid by Skytec was accounted for in the tax returns. Logistic did not put forth any evidence or witness to refute this assertion. Nor did Logistic introduce any evidence showing that Mr. Barreda's or Ms. Astor's compensation packages are not properly disclosed on their personal income tax returns. And, to the extent that Logistic argues that the debtor is otherwise mismanaging its assets, Ms. Astor testified that the business has been able to grow its cash balance during bankruptcy while keeping current on its accounts payable: no easy feat. Per

the last filed monthly operating report in the case, for September 2019, the debtor has an ending cash balance of $1,053,808.64. (Dkt. No. 257 at p. 2.)

Having examined Logistic's grounds for the appointment of a trustee under section 1104(a)(1), the court does not find that they, either individually or collectively, "[rise] to a level sufficient to warrant the appointment of a trustee." Comm. of Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 242 (4th Cir. 1987).

Allegations under section 1104(a)(2)

Turning to its argument under section 1104(a)(2), Logistic contends that Skytec's insiders have conflicts of interest that will prevent it from pursuing avoidance actions where the transaction were to their benefit. (Dkt. No. 149 at pp. 19-25.) Logistic maintains that this is why the appointment of a trustee is in the best interests of the estate and other parties. Id.

Under section 1104(a)(2), the moving party does not need to establish "cause," as it does under section 1104(a)(1). Instead, the court has more flexibility to "exercise . . . a spectrum of discretionary powers and equitable considerations." Petit v. New England Mortg. Servs., 182 B.R. 64, 69 (D. Me. 1995) (citation omitted.) In practice, however, "[i]n many instances the bankruptcy court's considerations relating to cause under § 1104(a)(1) and the best interests of the creditors under § 1104(a)(2) are 'intertwined and dependent upon the same facts.'" United Sur. & Indem. Co. v. López-Muñoz (In re López-Muñoz), 2016 Bankr. LEXIS 2748, at *40 (B.A.P. 1st Cir. July 28, 2016) (quoting In re Grasso, 490 B.R. 500, 506 (Bankr. E.D. Pa. 2013)).

Here, much of Logistic's arguments have already been addressed above under the framework of section 1104(a)(1). It is worth emphasizing again, though, that the debtor's

21

proposal to appoint a third party plan administrator should dispel, at least in part, any fear of conflicts of interest as it relates to the pursuit of avoidance actions and excessive compensation.

As to whether the appointment of a trustee is in the best interests of the estate and other parties, section 1104(a)(2) "is fact-specific and requires the court to balance the benefits of such an appointment against its anticipated costs." In re LHC, LLC, 497 B.R. at 293 (citation omitted).

Logistic maintains that the appointment of a trustee would benefit the estate since funds obtained from the voidance of preferential transfers and reduction of the insiders' excessive compensation would be used to pay creditors. As stated above, the court finds that Logistic did not prove that either Mr. Barreda's or Ms. Astor's compensation are excessive. And, as to the preference actions, the court found above that Mr. Carrasquillo's testimony and expert report raised significant questions about the viability of the preference actions Logistic has been pushing Skytec to pursue.

Regardless of the merits of the suits themselves, the court notes that Logistic's weighing of the costs and benefits of appointing a trustee ignores the practical effects such an appointment would have on this bankruptcy case. Most importantly, Logistic fails to take into account the significant delay that the appointment of a chapter 11 trustee would have on confirming a chapter 11 plan here. Even assuming that there are preference actions worth pursuing, realistically it would take months or more likely years for a trustee to be appointed, for him or her to file the necessary adversary proceedings, prosecute those cases through to judgment, and then collect on any judgment awarded. At that point, the trustee would

presumably be in a position to file another amended disclosure statement, which would need to be approved, and chapter 11 plan, which would need to be confirmed.

As Mr. Barreda testified, such a lengthy delay in the case would create serious impediments for Skytec's business, impacting its chances for a successful reorganization. As explained above, it would be very difficult for the company to obtain financing, either from traditional sources or private investors, to compete for bids or complete projects. Without special projects, Skytec's income would fall dramatically. Further, government contracts require bidders to obtain performance bonds, which companies in bankruptcy have additional hurdles in obtaining. For example, Mr. Barreda testified that Skytec has been able to obtain only one performance bond post petition, meaning since September 12, 2018, and that the bonding company had required a $200,000.00 deposit.

Mr. Barreda also explained that Skytec will need to send updated financial reports to local and federal government agencies by February 2020 as part of the bidding process. If there is no confirmed plan in place at that time showing Skytec's path to reorganization, it would be very difficult, and perhaps impossible, for the company to win any new projects.

In sum, the witnesses' testimonies paint a convincing picture that the appointment of a chapter 11 trustee could very well lead to a failed reorganization and the conversion of the case to chapter 7. Such an event would not be in the best interest of creditors. Per CPA Carrasquillo's testimony, and as stated in second amended disclosure statement, general unsecured creditors would not receive any dividend under a chapter 7 scenario versus the 20% payout projected under the proposed plan. (Debt. Ex. C at p. 29.) Furthermore, the court notes that it would be difficult for a chapter 11 trustee to operate the debtor's business given

23

the technical expertise required. Nor would a trustee have the ability to raise capital for the business through private loans, as Ms. Astor has done on several occasions.

In light of these practical concerns, the court, in its discretion under section 1104(a)(2), does not find that benefits of the appointment of a trustee outweighs the costs.

**V.     Conclusion**

In view of the foregoing, the court denies the motion to appoint a chapter 11 trustee at docket number 149. And, to the extent Logistic seeks–in the alternative–the appointment of an examiner, the court denies the request based on the same analysis.

IT IS SO ORDERED.

In Ponce, Puerto Rico, this 20th day of November, 2019.

Edward A. Godoy
U.S. Bankruptcy Judge